UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| OSAZEE NATHANIEL OBOH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 2:23-CV-00164-JRG-CRW |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Petitioner Osazee Nathaniel Oboh's Emergency Motion Pursuant to [28] U.S.C. § 2255 [Doc. 1], Mr. Oboh's Supplemental Memorandum [Doc. 3], the United States's Response [Doc. 4], Mr. Oboh's Reply [Doc. 5], Mr. Oboh's Letter Showing Prejudice [Doc. 7], Mr. Oboh's Addendum [Doc. 9], the United States's Notice of Supplemental Authority [Doc. 10], and Mr. Oboh's Response [Doc. 11]. For the reasons herein, the Court will order an evidentiary hearing on Mr. Oboh's motion.

### I. BACKGROUND

Mr. Oboh, now thirty-five years of age, is a Nigerian citizen who came to the United States in 2016, and in 2020, he became a lawful permanent resident in possession of a green card. [PSR, Doc. 348, ¶ 54, No. 2:20-CR-00062-6-JRG-CRW]. He has resided in Tennessee and Maryland, and he is married with two young children. [*Id.* ¶¶ 53–54]. In 2020, a federal grand jury—in a thirty-three-count indictment—charged him with conspiring to commit bank fraud, money laundering, and aggravated identify theft, in violation of 18 U.S.C. § 371 (Count One); conspiring to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349 (Count Two); and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(a) and (h) (Count

Three) [Indictment, Doc. 29, at 1–15, No. 2:20-CR-00062-6-JRG-CRW]. He went on to plead guilty to conspiring to commit bank fraud, money laundering, and aggravated identify theft, in violation of 18 U.S.C. § 371 (Count One). The factual basis of his plea agreement states:

> The defendant conspired with other individuals named in the indictment and not named in the indictment to commit bank fraud, money laundering, and aggravated identity theft. The conspiracy took place through the use of fraudulently created business banking accounts, fraudulently created payment processing accounts, fraudulently created personal banking and credit card accounts, and the use of a network of runners (to include defendant) who would obtain cash proceeds generated from the conspiracy through automated teller machines (ATMs) or other point of sale terminals that constituted the criminal proceeds of bank fraud.
> Typically, one or more members of the conspiracy (usually one or more persons situated in the Atlanta, Georgia area) would obtain fraudulent business bank accounts with financial institutions. These accounts often were in the names of actual businesses that had no knowledge that their business identity had been used to open a new account. One or more conspirators would then enter into agreements with one or more 'payment processors,' which are companies appointed by a business or merchant to process financial transactions, including debit card and credit card transactions, from various channels for banks and financial institutions.
> Payment processors assign a unique 'merchant identification number' to a business or merchant before the business or merchant begins processing payments by debit and credit card. After that, when a business or merchant uses a payment processor to process transactions, the business or merchant receives an electronic credit from the payment processor for processed credit card or debit card sales. The electronic credit is made to a checking account at a financial institution that the business or merchant provides to the payment processor when applying to do business with the payment processor. The electronic credit normally takes place within a day of any particular transaction.
> As part of the conspiracy, one or more conspirators would unlawfully obtain the personal identifying information of actual individuals and use that information to open :fraudulent bank accounts and fraudulent credit card information at various financial institutions, including Fifth Third National Bank ("Fifth Third") and Branch Banking and Trust Co. ('BB&T'). Both of these financial institutions carry federal deposit insurance. As part of the conspiracy, one or more conspirators would then cause the fraudulent business accounts to accept electronic payments from the fraudulently opened bank or credit card accounts, thereby generating proceeds. Also, as part of the conspiracy, one or more coconspirators (usually in the Atlanta, Georgia area) would cause access devices (usually in the form of debit cards) to be mailed to locations throughout the Eastern District of Tennessee and elsewhere. The access devices permitted a conspirator to withdraw the proceeds from the unlawful conspiracy proceeds. At that point, one or more runners (like

defendant) would obtain the fraudulent access devices and use them to engage in ATM or point of sale withdrawals.

Once a runner obtained cash with the fraudulent access devices, the runner would receive payment that typically ranged between five percent (5%) to ten percent (10%) of the cash obtained. The runner would then either transport the remaining proceeds (or assist others in transporting those proceeds) to one or more conspirators in the Atlanta, Georgia area.

In furtherance of the conspiracy, defendant committed a number of overt acts, some withing [sic] the Eastern District of Tennessee. For example, other participants in the conspiracy identified the defendant as a person who occasionally would act as a runner and as a person who had recruited other individuals in the Eastern District of Tennessee to act as runners. In addition, defendant was also an individual who other participants have identified as being involved with creating fraudulent consumer bank accounts.

As part of its internal investigation, Fifth Third Bank captured phone calls placed by a bank investigator to several of the purported owners of some of the fraudulent accounts. Specifically, bank investigators with Fifth Third Bank made a recorded call on March 4, 2019, to the purported owner of a listed account and whose given initials were A.R. Similarly, bank investigators with Fifth Third Bank made a recorded call on May 1, 2019, to the purported owner of a listed account and whose given initials were P.O. Both accounts were fraudulent, and the real A.R. and P.O. did not open the respective accounts. During the calls, defendant (whose voice was readily identified by one or more other conspirators) pretended to be each respective account holder, and defendant provided accurate personal identifying information that included dates of birth and social security numbers. The number the investigator called to reach the person using Overdorre's name was (816) 216-3804.

[Oboh Plea Agreement, Doc. 238, at 2–4, No. 2:20-CR-00062-6-JRG-CRW].

In the plea agreement, Mr. Oboh acknowledged that his guilty plea could affect his immigration status:

> 13. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. (Indeed, because the defendant is pleading guilty to conspiracy to commit bank fraud and aggravated identity theft, removal may be presumptively mandatory.) Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of the defendant's conviction on immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences the plea may entail, even if the consequence is automatic removal from the United States.

[Oboh Plea Agreement at 10–11]. In fact, Mr. Oboh's conviction for conspiring to commit bank fraud under § 371 placed him in danger of mandatory deportation under the plain language of 8 U.S.C. § 1227, which, in pertinent part, states:

> (2) Criminal offenses
>
> (A) General crimes
>
> (i) Crimes of *moral turpitude*
>
> Any alien who—
>
> (I) is convicted of a crime involving *moral turpitude* committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, *and*
>
> (II) is convicted of a crime for which a sentence of *one year or longer* may be imposed,
>
> is deportable.

18 U.S.C. § 1227(a)(2) (emphasis added);[1] *see Jordan v. De George*, 341 U.S. 223, 232 (1951) ("[C]rimes in which fraud was an ingredient have always been regarded as involving moral turpitude."). Also, Mr. Oboh agreed, under USSG § 2B1.1(b)(1),[2] that he was responsible for an actual-loss amount of up to $150,000, [Oboh Plea Agreement at 6], an amount that, in combination with his conviction for conspiring to commit bank fraud—a crime of moral turpitude—also subjected him to mandatory deportation under § 1227, *see* 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); *see also id.* § 1101(a)(43)(M)(i) (providing that an "aggravated

---

[1] "The term 'alien' means any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

[2] Section 2B1.1(b)(1) "is the Guideline used by courts in determining 'loss' for fraud cases," and it "enhances a defendant's sentence to correlate to the amount of loss caused [by his] fraud." *United States v. Triana*, 468 F.3d 308, 319–20 (6th Cir. 2006) (footnotes omitted) (citing USSG § 2B1.1(b)(1))). In short, under § 2B1.1(b)(1), the greater the loss, the greater the enhancement.

4

felony" means "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000").

At sentencing, his attorneys—Hunter Shelton, Corey Shipley, and Curt Collins—and the United States agreed that the loss amount was substantially lower and ranged between $40,000 and $95,000, [United States's Notice, Doc. 388, at 1 n.1, No. 2:20-CR-00062-6-JRG-CRW], but that range still meant Mr. Oboh was subject to mandatory deportation because the loss amount exceeded $10,000, *see* 8 U.S.C. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii). With a total offense level of fifteen and a criminal history category of I, he had an advisory guidelines range of eighteen to twenty-four months' imprisonment. [Statement of Reasons, Doc. 402, at 1, No. 2:20-CR-00062-6-JRG-CRW]. The Court sentenced him to twelve months and a day of imprisonment and three years of supervised release. [J., Doc. 401, at 2–3, No. 2:20-CR-00062-6-JRG-CRW].[3]

In the end, he faced mandatory deportation because he had received a sentence of a year or longer for a crime of moral turpitude, 18 U.S.C. § 1227(a)(2)(A); *Jordan*, 341 U.S. at 232, but even if he had received a sentence of less than a year, he still would have faced mandatory deportation because the amount of loss stemming from his fraudulent conduct was greater than $10,000, *id.* §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii). He has now completed his custodial sentence, but he informs the Court that he is in the United States Immigration and Customs Enforcement's ("ICE") custody. The United States Probation Office has notified the Court that he is scheduled to appear before an immigration court on February 5, 2025. In the interim, he moves this Court to vacate his conviction and sentence under 28 U.S.C. § 2255,

---

[3] Under Amendment 821 to Appendix C of the *United States Sentencing Commission Guidelines Manual*, the Court later reduced his sentence to eight months. [Order, Doc. 483, at 1, No. 2:20-CR-00062-6-JRG-CRW].

5

alleging several claims of ineffective assistance of counsel, and he moves for an evidentiary hearing. [Def.'s Mot. at 4]. The Court will now address whether he has met his "relatively light" burden of establishing his right to an evidentiary hearing, *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (internal quotation mark and quotation omitted); *see* 28 U.S.C. § 2255(b) (requiring a "prompt hearing" on a post-conviction motion unless the motion and record conclusively establish that the petitioner is not entitled to relief).

## II. ANALYSIS

Under § 2255, "[a] prisoner *in custody* . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255 (emphasis added). Because Mr. Oboh has yet to complete his term of supervised release and, to date, has yet to be deported, he remains "in custody" under § 2255, and the Court has jurisdiction to address his § 2255 motion. *See Maleng v. Cook*, 490 U.S. 488, 491 (1989) ("Our interpretation of the 'in custody' language has not required that a prisoner be physically confined in order to challenge his sentence on habeas corpus."); *United States v. Zack*, No. 98-1526, 1999 WL 96996, at *1 (6th Cir. Feb. 1, 1999) ("A defendant serving a term of supervised release is 'in custody' for the purposes of § 2255." (citations omitted)); *United States v. Astorga*, No. CR S–99–0270 WBS GGH, 2008 WL 2446119, at *3 (E.D. Cal. June 12, 2008) ("The bottom line is that because supervised release had not been extinguished while [the petitioner] was in ICE custody pending deportation . . . the court has jurisdiction to adjudicate the § 2255 motion[.]"); *see also Navarro-Calderon v. United States*, Cv. No. 2:20-cv-02306-SHL-atc, Cr. No. 2:09-cr-20369-BBD, 2023 WL 6150255, at *3 (W.D. Tenn. Sept. 20, 2023) (denying as moot the petitioner's § 2255 motion when he had been deported and

"[was] not, therefore, being supervised by the probation office"); *Sekyere v. United States*, Nos. 89 C 8690, 88 CR 509–1, 1990 WL 77899, at *2 (N.D. Ill. May 21, 1990) ("There is ample authority which holds that a habeas corpus petition . . . becomes moot once the petitioner is deported from the United States and that the district court has no jurisdiction to consider such a petition." (citations omitted)); *but see cf. United States v. Papajani*, No. 95–3783, 1996 WL 143461, at *1 (6th Cir. Mar. 28, 1996) ("A defendant's direct criminal appeal is not rendered moot merely because he has completed serving his term of imprisonment and been deported." (citing *United States v. Valdez-Gonzalez*, 957 F.2d 643, 646–47 (9th Cir. 1992))).

In pursuing relief under § 2255, Mr. Oboh contends that his attorneys were ineffective because they failed to inform him that mandatory deportation was a collateral consequence of his conviction. [Def.'s Mot. at 1–2]. He raises a similar contention regarding the amount of loss for which he is responsible under § 2B1.1. *See* [*id.* at 2 ("A loss amount . . . higher than $10,000 . . . would have immigration consequences" and "could be catastrophic . . . . I told [my attorneys] to investigate this . . . [b]ut they did not, instead they insisted I accept the amount for a more favorable sentence.")]. With these two contentions, Mr. Oboh alleges violations of the Sixth Amendment of the United States Constitution, [*id.* at 2], which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right is the right not merely to representation but *effective* representation. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).

When a petitioner like Mr. Oboh contests his conviction and sentence by raising the specter of ineffective assistance of counsel, he normally can succeed only by satisfying the familiar *Strickland* test—a two-pronged test that requires a showing of deficient performance on counsel's part and prejudice. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). To

7

Case 2:23-cv-00164-JRG-CRW   Document 14   Filed 01/02/25   Page 7 of 16   PageID #: 64

establish deficient performance, a petitioner must show that his counsel, through the prism of an objective standard of reasonableness, "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. *Id.* at 687. *Strickland*'s two-pronged test applies to counsel's actions in the guilty-plea context, *Hill v. Lockhart*, 474 U.S. 52, 58 (1985), and counsel's failure to advise his client, "whether a citizen or not," that his guilty plea carries a risk of deportation is objectively unreasonable and constitutes deficient performance, *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010).

This objectively unreasonable conduct occurs when counsel "either fails to mention the risk of deportation or specifically discounts such a risk." *Rodriguez-Penton v. United States*, 905 F.3d 481, 487 (6th Cir. 2018) (citing *id.* at 359, 368–69). Mr. Oboh's allegations encompass each of these types of failures on his counsel's part. *See* [Def.'s Mot. at 1–2 (claiming that his counsel downplayed the risk of deportation by "reassur[ing] [him] of probation" and saying "there'll be no jail time"); Def.'s Letter at 1 (alleging that his counsel advised him that his conviction "wouldn't result [in] deportation"); Def.'s Addendum at 1 (asserting that his counsel "told [him] that [he] would not be deported if [he] accept[ed] the plea deal")]. And while the Court acknowledges that "[i]mmigration law can be complex, and it is a legal specialty of its own," the consequences of Mr. Oboh's guilty plea—namely, deportation—could "easily be determined from reading the removal statute." *Padilla*, 559 U.S. at 369; *see id.* ("[W]hen the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.").

Mr. Oboh's allegations of deficient performance—adequate, as they are—now prompt the Court to shift its inquiry to the second prong: prejudice. To establish prejudice, a petitioner like Mr. Oboh must demonstrate that his counsel's deficient performance was so serious that it

deprived him of his fundamental right to due process, *Strickland*, 466 U.S. at 687, or in other words, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. In the guilty-plea context, specifically, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

But in "a case like this one—where a criminal defendant risks deportation by pleading guilty and his counsel [allegedly] fails to so advise him—*Hill* does not encompass all the methods of satisfying *Strickland*'s prejudice prong." *Rodriguez-Penton*, 905 F.3d at 489. In addition to the ways that a petitioner can demonstrate prejudice under *Hill*, a petitioner can establish prejudice by showing that, "had he known about the risk of adverse immigration consequences, he would have bargained for a more favorable plea," i.e., one "that d[oes] not carry adverse immigration consequences." *Id.* at 488. Mr. Oboh "may make this showing in any number of ways, such as by showing similar plea agreements that were reached by others charged with the same crime." *Id.* at 489 (citing *United States v. Rodriguez-Vega*, 797 F.3d 781, 788 (9th Cir. 2015)); *see Rodriguez-Vega*, 797 F.3d at 788 ("A petitioner may demonstrate that there existed a reasonable probability of negotiating a better plea by identifying cases indicating a willingness by the government to permit defendants charged with the same or a substantially similar crime to plead guilty to a non-removable offense.").

In attempting to establish prejudice, Mr. Oboh maintains that he "would have rather negotiated a better plea . . . for the purpose of immigration or would have otherwise gone to trial," [Reply at 2], and he directs the Court's attention to his co-defendant, Efosa Imasuen. [Def.'s Mot. at 3]. Mr. Oboh and Mr. Imasuen each entered guilty pleas before United States

9

Magistrate Judge Cynthia R. Wyrick on the same morning and at the same time. [Minute Entry, Doc. 283, at 1, No. 2:20-CR-00062-4-JRG-CRW; Minute Entry, Doc. 286, at 1, No. 2:20-CR-00062-6-JRG-CRW]. The fact that Mr. Oboh's and Mr. Imasuen's plea hearings took place together, i.e. contemporaneously, is important. *See United States v. Singh*, 95 F.4th 1028, 1034 (6th Cir. 2024) (stating that a petitioner, to establish prejudice by showing that he would have bargained for a plea that did not compromise his immigration status, must "cite . . . evidence contemporaneous with his plea" because "post hoc assertions . . . aren't enough"). According to Mr. Oboh, Mr. Imasuen, who is also a citizen of Nigeria and a lawful permanent resident of the United States, [PSR, Doc. 358, ¶¶ 49, 52, No. 2:20-CR-00062-4-JRG-CRW], secured a plea agreement that did not trigger mandatory deportation even though he was charged with the same offenses as Mr. Oboh, [Def.'s Mot. at 3].

Mr. Imasuen was indeed charged with the same offenses as Mr. Oboh—and more. Like Oboh, Mr. Imasuen was charged in Counts One, Two, and Three, but unlike Mr. Oboh, he was also charged with separate offenses in Counts Four and Five (bank fraud and aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 1344 and 2), in Counts Fifteen and Sixteen (money laundering, in violation of 18 U.S.C. § 1956(a)), and in Counts Twenty-Five and Twenty-Six (aggravated identity theft and aiding and abetting aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2). [Indictment at 15–23]. In the indictment, the United States viewed Mr. Imasuen as the more culpable defendant in the conspiracy; it ranked him as the fourth most culpable defendant, whereas it ranked Mr. Oboh as the sixth most culpable defendant. In the end, Mr. Oboh and Mr. Imasuen both pleaded guilty to Count One, which, in the indictment, was the charge of conspiring to commit bank fraud, money laundering, and aggravated identify

theft, in violation of 18 U.S.C. § 371. [Oboh Plea Agreement at 1; Imasuen Plea Agreement, Doc. 270, at 1, No. 2:20-CR-00062-4-JRG-CRW].

But the United States allowed Mr. Imasuen to plead only to a fragment of that charge: conspiring to commit money laundering, in violation of § 371. [Imasuen Plea Agreement at 1].[4] Mr. Oboh, on the other hand, pleaded to Count One in its entirety: conspiring to commit bank fraud, money laundering, and aggravated identify theft, in violation of § 371. [Oboh Plea Agreement at 1]. Mr. Imasuen's plea to a partial charge was, at least facially, benign to his immigration status, and an overview of § 371 shows why. Section 371 is the federal general conspiracy statute—as distinct from other federal conspiracy statutes that deal with specific types of conspiracies, like the RICO conspiracy statute under 18 U.S.C. § 1962(d)—and it proscribes a conspiracy (1) to commit an offense against the United States or (2) to defraud the United States:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. The statute's first clause is known as the "offense clause," whereas its second clause is known as the "defraud clause." *See United States v. Minarik*, 875 F.2d 1186, 1186–87 (6th Cir. 1989) ("The statute is written in the disjunctive in order to criminalize two categories of conduct: conspiracies to commit offenses specifically defined elsewhere in the federal criminal code, and conspiracies to defraud the United States.").

---

[4] During the plea hearing before Judge Wyrick, Mr. Imasuen's counsel stated that Mr. Imasuen was "pleading guilty to the portion of Count One that charges conspiracy to commit money laundering, not bank fraud or aggravated identity theft," [Plea Hr'g Tr. at 23:27–23:35 (on file with the Court)], and the United States described the charge in Count One as a "multi-object conspiracy," [*id.* at 24:27–24:32].

11

By permitting Mr. Imasuen to plead to guilty to the crime of conspiracy to commit money laundering under the offense clause and not the crime of conspiracy to commit bank fraud under the defraud clause, the United States allowed him to avoid a conviction for a crime that had fraud as an ingredient, or a crime of moral turpitude. *See* 8 U.S.C. § 1227(a)(2)(A)(i) (stating that a crime of moral turpitude is a deportable offense if it results in a sentence of a year or more); *see also Jordan*, 341 U.S. at 232 ("[C]rimes in which fraud was an ingredient have always been regarded as involving moral turpitude.").[5] Mr. Imasuen's advisory guidelines range was ten to sixteen months' imprisonment, [Statement of Reasons, Doc. 464, at 1, No. 2:20-CR-00062-4-JRG-CRW]—lower than Mr. Oboh's because, unlike Mr. Oboh, Mr. Imasuen received no enhancement under § 2B1.1. The Court sentenced Mr. Imasuen to two years of probation. [J., Doc. 463, at 2, No. 2:20-CR-00062-4-JRG-CRW]. So not only did Mr. Imasuen's conviction not qualify as one of moral turpitude but also it did not result in a sentence of a year or more, and he was therefore, at least ostensibly, under no threat of mandatory deportation from his guilty plea. *See* 18 U.S.C. § 1227(a)(2)(A)(i)(I)–(II).

The United States now attempts to explain why it allowed Mr. Imasuen to plead to a truncated version of the charge in Count One—which did not include fraudulent conduct and therefore did not expose him to the risk of deportation—but did not offer Mr. Oboh the same accommodation. In the United States's view, Mr. Oboh and Mr. Imasuen "are not identically situated." [United States's Resp. at 6]. The United States argues that Mr. Imasuen was only "a runner who withdrew cash from the fraudulently created accounts" and that Mr. Oboh, "by contrast, not only acted as a runner, but also recruited others to do so and helped create some

---

[5] Incidentally, a conspiracy to commit money laundering under 18 U.S.C. § 1956(h) is a deportable offense, 8 U.S.C. § 1101(a)(43)(D), *id.* § 1227(a)(2)(A)(iii), but the Court is unaware of any legal authority that identifies a conspiracy to commit money laundering under § 371 as a deportable offense.

12

Case 2:23-cv-00164-JRG-CRW Document 14 Filed 01/02/25 Page 12 of 16
PageID #: 69

of the fraudulent accounts." [*Id.*]. According to the United States, any contention that it would have permitted Mr. Oboh to enter into a plea agreement that was similar to Mr. Imasuen's is "speculat[ion]." [*Id.*].

In a silo, maybe it is speculation, but alongside the contemporaneous evidence in the record, it has substance. Again, Mr. Imasuen, by ranking, was more culpable in the conspiracy than Mr. Oboh, and yet Mr. Imasuen—and not Mr. Oboh—received a plea agreement that spared him of a charge of fraud and the collateral consequence of deportation. Under the legal standard that governs prejudice, the disparate effect that Mr. Oboh's and Mr. Imasuen's plea agreements had on their respective immigration statuses is evidence of "a willingness by the government to permit [a] defendant[] charged with the same or a substantially similar crime to plead guilty to a non-removable offense." *Rodriguez-Vega*, 797 F.3d at 788; *see Rodriguez-Penton*, 905 F.3d at 489 (recognizing that a petitioner can demonstrate prejudice "by showing similar plea agreements that were reached by others charged with the same crime" (citing *id.*)).

And while the United States argues that Mr. Oboh and Mr. Imasuen "are not identically situated," [United States's Resp. at 6], it "has not offered any countervailing evidence that [Mr. Oboh] could not have secured a more favorable plea," *Rodriguez-Penton*, 905 F.3d at 490. In fact, the United States appears to fault—if only subtly—Mr. Oboh's counsel for not securing a more favorable plea for Mr. Oboh, as it pertains to his immigrations status. Indeed, the United States seems to leave open the question of whether it would have "acquiesced" to Mr. Oboh's request for a plea similar to Mr. Imasuen's "*had* [Mr. Oboh's] counsel asked for [one]." [United States's Resp. at 6 (emphasis added); *see* Def.'s Mot. at 3 (alleging that Mr. Imasuen's "attorney did his due diligence for his client who is also a Non-U.S. citizen to avoid further and future immigration consequences" and that Mr. Oboh's "attorneys did no such [thing]" for him)].

13

But the United States contends that "[e]ven if counsel had misadvised Oboh about his likely sentence, Oboh cannot establish any prejudice, because the magistrate judge necessarily ensured, during the plea colloquy, that Oboh was correctly advised of the applicable penalties." [United States's Resp. at 7]. Judge Wyrick, though, neither addressed nor ensured Mr. Oboh's understanding of paragraph thirteen of the plea agreement, which contained the language that deportation "may be presumptively mandatory," [Oboh Plea Agreement at 10], but she did generically warn him that his guilty plea could result in his deportation, *see* [Plea Hr'g Tr. at 25:43–25:48 (on file with the Court) ("If you are not a United States citizen, the conviction may also cause you to be removed from the United States[.]")]. In response to her warning, Mr. Oboh voiced his understanding and his desire to plead guilty anyway. [*Id.* at 25:55–26:16]. Judge Wyrick's general warning satisfied Federal Rule of Criminal Procedure 11, which requires courts to "inform the defendant of, and determine that the defendant understands," that "if convicted, a defendant who is not a United States citizen may be removed from the United States." Fed. R. Crim. P. 11(b)(1)(O); *see Singh*, 95 F.4th at 1032–33 (rejecting the petitioner's post-conviction claim that the district court violated Rule 11 when it gave a "'generic warning' that pleading guilty 'may' have 'immigration-related consequences'" because "Rule 11 requires only a 'generic warning'" (quotation omitted)).

Mr. Oboh, however, does not allege a violation of Rule 11, and he does not accuse the Court of violating his constitutional rights by not passably advising him that deportation was a direct consequence of his guilty plea—and nor could he. The Court has no *constitutional* obligation to ensure his understanding that his guilty plea could affect his citizenship. *Singh*, 95 F.4th at 1032. His counsel, however, *does* have this constitutional obligation, *Padilla*, 559 U.S. at 374, and because of "[t]he severity of deportation," *id.* at 373, which is "the equivalent

14

of banishment or exile," *id.* (internal quotation mark and quotation omitted), and "may be more important to the client than any potential jail sentence," *id.* at 368 (internal quotation mark and quotation omitted), several higher courts have held that—in the face of counsel's *affirmative misadvice* to a client about his risk of deportation from a guilty plea—a district court's general warning about deportation during the plea colloquy is not curative, *see Lee v. United States*, 582 U.S. 357, 362, 369 (2017) (holding that the petitioner had demonstrated prejudice when his attorney wrongfully advised him that "the government cannot deport you," even though the district court during the plea colloquy had informed the petitioner that "a conviction 'could result in your being deported'"); *United States v. Akinsade*, 686 F.3d 248, 254 (4th Cir. 2012) (determining that the district court's "general and equivocal" warning that the petitioner's plea "*could* lead to deportation" was "insufficient to correct counsel's affirmative misadvice that [the petitioner's] crime was not categorically a deportable offense" (footnote omitted)); *see also Dat v. United States*, 920 F.3d 1192, 1195 (8th Cir. 2019) (stating that "counsel's alleged misadvice specifically undermined [the district court's] equivocal warnings" that his conviction "'could affect' his immigration status"); *Doe v. United States*, 915 F.3d 905, 908, 913 (2d Cir. 2019) (holding that the district court did not remedy counsel's misadvice—that deportation was not a mandatory result of the guilty plea—when it asked the defendant if he understood he "may be deported" and did not inform him of the "mandatory consequences" of his plea to an aggravated felony).

Mr. Oboh has alleged affirmative misadvice on his counsel's part. *See* [Def.'s Letter at 1 (claiming that his counsel advised him that his conviction "wouldn't result in deportation"); Def.'s Addendum at 1 (asserting that his counsel "told [him] that [he] would not be deported if [he] accept[ed] the plea deal")]. He has therefore discharged his "relatively light" burden of

15

establishing his entitlement to an evidentiary hearing, *Martin*, 889 F.3d at 832, and the Court **ORDERS** as follows:

1. The parties are **ORDERED** to appear before the Court for an evidentiary hearing on Monday, January 27, 2025, at 9:00 a.m. At the evidentiary hearing, the parties **SHALL** be prepared to address Mr. Oboh's claim that his former counsel—Mr. Shelton, Mr. Shipley, and Mr. Collins—advised him that deportation would not be a collateral consequence of his guilty plea;

2. Casey Sears, Esq., a member of the CJA panel, is hereby **APPOINTED** to represent Mr. Oboh at the evidentiary hearing. 18 U.S.C. § 3006A(a)(2)(B);

3. ICE is hereby **ORDERED** to return Mr. Oboh to the custody of the United States Marshals Service for his evidentiary hearing;

4. The Court **AUTHORIZES** and **INSTRUCTS** the United States Marshals Service to lodge a detainer with ICE to provide direct transfer of custody of Mr. Oboh from ICE back to the United States Marshals Service; and

5. The United States Marshals Service is **ORDERED** to return Mr. Oboh to this district for the evidentiary hearing.

So ordered.

ENTER:

s/J. RONNIE GREER<br>
UNITED STATES DISTRICT JUDGE