UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

OSAZEE NATHANIEL OBOH,          )
                               )
          Petitioner,          )
                               )
v.                             )          No. 2:23-CV-00164-JRG-CRW
                               )
UNITED STATES OF AMERICA,      )
                               )
          Respondent.          )

**REDACTED MEMORANDUM OPINION**

This matter is before the Court on Petitioner Osazee Nathaniel Oboh's Emergency Motion Pursuant to [28] U.S.C. § 2255 [Doc. 1], Mr. Oboh's Supplemental Memorandum [Doc. 3], the United States's Response [Doc. 4], Mr. Oboh's Reply [Doc. 5], Mr. Oboh's Letter Showing Prejudice [Doc. 7], Mr. Oboh's Addendum [Doc. 9], the United States's Notice of Supplemental Authority [Doc. 10], and Mr. Oboh's Response [Doc. 11]. For the reasons herein, the Court will deny Mr. Oboh's motion, but it will grant him a certificate of appealability.

## I.  BACKGROUND

Mr. Oboh, now thirty-five years of age, is a Nigerian citizen who came to the United States in 2016, and in 2020, he became a lawful permanent resident in possession of a green card. [PSR, Doc. 348, ¶ 54, No. 2:20-CR-00062-6-JRG-CRW]. He has resided in Tennessee and Maryland, and he is married with two young children. [*Id.* ¶¶ 53–54]. In 2020, a federal grand jury—in a thirty-three-count indictment—charged him with conspiring to commit bank fraud, money laundering, and aggravated identify theft, in violation of 18 U.S.C. § 371 (Count One); conspiring to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349 (Count Two); and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(a) and (h) (Count

Three) [Indictment, Doc. 29, at 1–15, No. 2:20-CR-00062-6-JRG-CRW]. He went on to plead

guilty to conspiring to commit bank fraud, money laundering, and aggravated identify theft, in

violation of 18 U.S.C. § 371 (Count One). The factual basis of his plea agreement states:

> The defendant conspired with other individuals named in the indictment and not named in the indictment to commit bank fraud, money laundering, and aggravated identity theft. The conspiracy took place through the use of fraudulently created business banking accounts, fraudulently created payment processing accounts, fraudulently created personal banking and credit card accounts, and the use of a network of runners (to include defendant) who would obtain cash proceeds generated from the conspiracy through automated teller machines (ATMs) or other point of sale terminals that constituted the criminal proceeds of bank fraud.
>
> Typically, one or more members of the conspiracy (usually one or more persons situated in the Atlanta, Georgia area) would obtain fraudulent business bank accounts with financial institutions. These accounts often were in the names of actual businesses that had no knowledge that their business identity had been used to open a new account. One or more conspirators would then enter into agreements with one or more 'payment processors,' which are companies appointed by a business or merchant to process financial transactions, including debit card and credit card transactions, from various channels for banks and financial institutions.
>
> Payment processors assign a unique 'merchant identification number' to a business or merchant before the business or merchant begins processing payments by debit and credit card. After that, when a business or merchant uses a payment processor to process transactions, the business or merchant receives an electronic credit from the payment processor for processed credit card or debit card sales. The electronic credit is made to a checking account at a financial institution that the business or merchant provides to the payment processor when applying to do business with the payment processor. The electronic credit normally takes place within a day of any particular transaction.
>
> As part of the conspiracy, one or more conspirators would unlawfully obtain the personal identifying information of actual individuals and use that information to open fraudulent bank accounts and fraudulent credit card information at various financial institutions, including Fifth Third National Bank ('Fifth Third') and Branch Banking and Trust Co. ('BB&T'). Both of these financial institutions carry federal deposit insurance. As part of the conspiracy, one or more conspirators would then cause the fraudulent business accounts to accept electronic payments from the fraudulently opened bank or credit card accounts, thereby generating proceeds. Also, as part of the conspiracy, one or more coconspirators (usually in the Atlanta, Georgia area) would cause access devices (usually in the form of debit cards) to be mailed to locations throughout the Eastern District of Tennessee and elsewhere. The access devices permitted a conspirator to withdraw the proceeds from the unlawful conspiracy proceeds. At that point, one or more runners (like

defendant) would obtain the fraudulent access devices and use them to engage in ATM or point of sale withdrawals.

Once a runner obtained cash with the fraudulent access devices, the runner would receive payment that typically ranged between five percent (5%) to ten percent (10%) of the cash obtained. The runner would then either transport the remaining proceeds (or assist others in transporting those proceeds) to one or more conspirators in the Atlanta, Georgia area.

In furtherance of the conspiracy, defendant committed a number of overt acts, some withing [sic] the Eastern District of Tennessee. For example, other participants in the conspiracy identified the defendant as a person who occasionally would act as a runner and as a person who had recruited other individuals in the Eastern District of Tennessee to act as runners. In addition, defendant was also an individual who other participants have identified as being involved with creating fraudulent consumer bank accounts.

As part of its internal investigation, Fifth Third Bank captured phone calls placed by a bank investigator to several of the purported owners of some of the fraudulent accounts. Specifically, bank investigators with Fifth Third Bank made a recorded call on March 4, 2019, to the purported owner of a listed account and whose given initials were A.R. Similarly, bank investigators with Fifth Third Bank made a recorded call on May 1, 2019, to the purported owner of a listed account and whose given initials were P.O. Both accounts were fraudulent, and the real A.R. and P.O. did not open the respective accounts. During the calls, defendant (whose voice was readily identified by one or more other conspirators) pretended to be each respective account holder, and defendant provided accurate personal identifying information that included dates of birth and social security numbers. The number the investigator called to reach the person using Overdorre's name was (816) 216-3804.

[Oboh Plea Agreement, Doc. 238, at 2–4, No. 2:20-CR-00062-6-JRG-CRW].

In the plea agreement, Mr. Oboh acknowledged that his guilty plea could affect his immigration status:

13. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. (Indeed, because the defendant is pleading guilty to conspiracy to commit bank fraud and aggravated identity theft, removal may be presumptively mandatory.) Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney and the Court, can predict to a certainty the effect of the defendant's conviction on immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences the plea may entail, even if the consequence is automatic removal from the United States.

3

[Oboh Plea Agreement at 10–11]. In fact, Mr. Oboh's conviction for conspiring to commit bank fraud under § 371 placed him in danger of mandatory deportation under the plain language of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.* Under the INA, an alien is removable if he is either "inadmissible" under § 1182 or "deportable" under § 1227. Section 1227, in pertinent part, states:

(2) Criminal offenses

    (A) General crimes

        (i) Crimes of *moral turpitude*

        Any alien who—

            (I) is convicted of a crime involving *moral turpitude* committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under <u>section 1255(j)</u> of this title) after the date of admission, *and*

            (II) is convicted of a crime for which a sentence of *one year or longer* may be imposed,

    is deportable.

8 U.S.C. § 1227(a)(2)(A)(i) (emphasis added);[1] *see Jordan v. De George*, 341 U.S. 223, 232 (1951) ("[C]rimes in which fraud was an ingredient have always been regarded as involving moral turpitude.").

    In addition, § 1227 states that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable," 8 U.S.C. § 1227(a)(2)(A)(iii), and an "aggravated felony" is "an offense that . . . involves fraud or deceit in which the loss to the victim or

---

[1] "The term 'alien' means any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

victims exceeds $10,000." *Id.* § 1101(a)(43)(M)(i). Under USSG § 2B1.1(b)(1),[2] Mr. Oboh acknowledged in his plea agreement that he was responsible for an actual-loss amount of up to $150,000, [Oboh Plea Agreement at 6], and that amount, in tandem with his conviction for conspiring to commit bank fraud, also placed him in danger of mandatory deportation for the commission of an aggravated felony.[3] In a similar vein, Mr. Oboh acknowledged in his plea agreement that "the Court shall order restitution" to his victims, [*id.* at 8], and at sentencing, the Court did so, ordering restitution in the amount of $40,000, [J., Doc. 401, at 6, No. 2:20-CR-00062-6-JRG-CRW]—a sum that the parties agreed was proper under the Sentencing Guidelines, [Sent'g Hr'g Tr., Doc. 494, at 13:14–18; 23:4–10, No. 2:20-CR-00062-6-JRG-CRW]. Mr. Oboh paid the restitution in its entirety after selling his car and withdrawing his savings. [*Id.* at 23:8–10; 30:9–25; 31:1–8; 52:25–1; 53:1–2].

At sentencing, the parties also agreed that the loss amount under USSG § 2B1.1(b)(1) was substantially lower than $150,000 and ranged between $40,000 and $95,000. [United States's Notice, Doc. 388, at 1 n.1, No. 2:20-CR-00062-6-JRG-CRW]. That range still posed a threat of deportation because it totaled a loss amount greater than $10,000. *See* 8 U.S.C. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii). With a total offense level of fifteen and a criminal history category of I, Mr. Oboh had an advisory guidelines range of eighteen to twenty-four

---

[2] Section 2B1.1(b)(1) "is the Guideline used by courts in determining 'loss' for fraud cases," and it "enhances a defendant's sentence to correlate to the amount of loss caused [by his] fraud." *United States v. Triana*, 468 F.3d 308, 319–20 (6th Cir. 2006) (footnotes omitted) (citing USSG § 2B1.1(b)(1))). In short, under § 2B1.1(b)(1), the greater the loss, the greater the enhancement.

[3] The Supreme Court has stated that a determination of loss under § 1101(a)(43)(M)(i) "must be tied to the specific counts covered by the conviction." *Nijhawan v. Holder*, 557 U.S. 29, 42 (2009) (internal quotation marks and quotation omitted). In determining whether a defendant's offense has resulted in a loss to a victim or victims that exceeds $10,000 under § 1101(a)(43)(M)(i), some courts have looked to the amount of restitution that the defendant owes, *see, e.g.*, *Nijhawan*, 557 U.S. at 43; *Pilla v. Holder*, 458 F. App'x 518, 521 (6th Cir. 2012), while others have looked to the amount of actual loss that the defendant caused under USSG § 2B1.1, *see Khalulyan v. Garland*, 63 F.4th 1207, 1210, 1212–13 (9th Cir. 2023); *Rad v. Att'y Gen. of the U.S.*, 983 F.3d 651, 656–57, 658, 666–69 (3d Cir. 2020).

months' imprisonment. [Statement of Reasons, Doc. 402, at 1, No. 2:20-CR-00062-6-JRG-CRW]. The Court sentenced him to twelve months and a day of imprisonment and a three-year term of supervised release. [J. at 2–3].[4]

Mr. Oboh has now completed his custodial sentence, but he informs the Court that he is in the United States Immigration and Customs Enforcement's ("ICE") custody and the subject of deportation proceedings. Those proceedings are pending, and in the interim, he moves this Court to vacate his conviction and sentence under 28 U.S.C. § 2255, alleging claims of ineffective assistance of counsel against his former attorneys—Hunter Shelton, Corey Shipley, and Curt Collins. His claims include allegations that his attorneys rendered ineffective assistance of counsel because they failed to advise him that deportation was a mandatory consequence of his guilty plea. The Court ordered and held an evidentiary hearing on Mr. Oboh's motion, and during the hearing, Mr. Oboh, Mr. Shelton, Mr. Shipley, and Mr. Collins all testified.[5] Mr. Shelton, Mr. Shipley, and Mr. Collins all advised Mr. Oboh that deportation was a *possible* risk of his guilty plea, but none of them advised Mr. Oboh that deportation was a *mandatory* consequence of his guilty plea. And Mr. Collins, specifically, testified that he could not recall a point during Mr. Oboh's case when he researched whether deportation was mandatory under the INA. Having considered the evidence and the parties' arguments, the Court is now prepared to rule on Mr. Oboh's motion.

---

[4] Under Amendment 821 to Appendix C of the *United States Sentencing Commission Guidelines Manual*, the Court later reduced his sentence to eight months. [Order, Doc. 483, at 1, No. 2:20-CR-00062-6-JRG-CRW].
[5] Mr. Oboh interacted with all three attorneys, but he had the most interaction with Mr. Collins. *See* [Hr'g Tr. (on file with the Court) ("So it was like in terms of like priority my number one was Mr. Collins, number two was Mr. Hunter, and three would be Mr. Shipley.")].

6

## II. LEGAL STANDARD

Under § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . claiming the right to be released . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). A court must vacate and set aside a sentence if it concludes that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." *Id.* § 2255(b). The legal standard that governs collateral review under § 2255, as opposed to direct review on appeal, is significantly higher. *United States v. Frady*, 456 U.S. 152, 162–66 (1982); *see Hampton v. United States*, 191 F.3d 695, 698 (6th Cir. 1999) ("Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'" (quoting *Reed*, 512 U.S. at 354)). This is so because "[t]he reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system." *Addonizio*, 442 U.S. at 184 (footnote omitted); *see Custis v. United States*, 511 U.S. 485, 497 (1994) ("'[I]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures' and inevitably delay and impair the orderly administration of justice." (quotation omitted)); *Parke v. Raley*, 506 U.S. 20, 29 (1992) (referring to a "presumption deeply rooted in our jurisprudence: the 'presumption of regularity' that attaches to final judgments" (quotation omitted)).

"A prisoner seeking relief under § 2255 'must allege as a basis for relief: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (quotation omitted). To obtain relief for a denial or

infringement of a constitutional right, a petitioner has to establish an "error of constitutional magnitude which had a substantial and injurious effect or influence on the [underlying] proceedings." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)). To obtain relief for a non-constitutional claim, a petitioner must establish that a fundamental defect in the proceeding resulted in a complete miscarriage of justice or an egregious error that deprived him of "the rudimentary demands of fair procedure." *Reed v. Farley*, 512 U.S. 339, 354 (1994); *see Grant v. United States*, 72 F. 3d 503, 505–06 (6th Cir. 1996).

A petitioner has the burden of proving that "an error has occurred that is sufficiently fundamental to come within" one of the three "narrow limits" for § 2255 relief. *United States v. Addonizio*, 442 U.S. 178, 185 (1979); *see Pough*, 442 F.3d at 964. To discharge this burden, a petitioner must allege sufficient facts showing entitlement to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972). "Generally, courts have held that 'conclusory allegations alone, without supporting factual averments, are insufficient to state a valid claim under § 2255.'" *Jefferson v. United States*, 730 F.3d 537, 547 (6th Cir. 2003) (quotation and citation omitted).

### III.  ANALYSIS

Again, § 2255 states that "[a] prisoner *in custody* . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255 (emphasis added). Because Mr. Oboh has yet to finish his term of supervised release and, to date, has yet to be deported, he remains "in custody" under § 2255, and the Court has jurisdiction to address his § 2255 motion. *See Maleng v. Cook*, 490 U.S. 488, 491 (1989) ("Our interpretation of the 'in custody' language has not required that a prisoner be physically

8

confined in order to challenge his sentence on habeas corpus."); *United States v. Zack*, No. 98-1526, 1999 WL 96996, at *1 (6th Cir. Feb. 1, 1999) ("A defendant serving a term of supervised release is 'in custody' for the purposes of § 2255." (citations omitted)); *United States v. Astorga*, No. CR S–99–0270 WBS GGH, 2008 WL 2446119, at *3 (E.D. Cal. June 12, 2008) ("The bottom line is that because supervised release had not been extinguished while [the petitioner] was in ICE custody pending deportation . . . the court has jurisdiction to adjudicate the § 2255 motion[.]"); *see also Navarro-Calderon v. United States*, Cv. No. 2:20-cv-02306-SHL-atc, Cr. No. 2:09-cr-20369-BBD, 2023 WL 6150255, at *3 (W.D. Tenn. Sept. 20, 2023) (denying as moot the petitioner's § 2255 motion when he had been deported and "[was] not, therefore, being supervised by the probation office"); *Sekyere v. United States*, Nos. 89 C 8690, 88 CR 509–1, 1990 WL 77899, at *2 (N.D. Ill. May 21, 1990) ("There is ample authority which holds that a habeas corpus petition . . . becomes moot once the petitioner is deported from the United States and that the district court has no jurisdiction to consider such a petition." (citations omitted)); *but see cf. United States v. Papajani*, No. 95–3783, 1996 WL 143461, at *1 (6th Cir. Mar. 28, 1996) ("A defendant's direct criminal appeal is not rendered moot merely because he has completed serving his term of imprisonment and been deported." (citing *United States v. Valdez-Gonzalez*, 957 F.2d 643, 646–47 (9th Cir. 1992))).

In pursuing relief under § 2255, Mr. Oboh contends that his attorneys were ineffective because they failed to investigate his case and inform him that mandatory deportation was a collateral consequence of his guilty plea. [Def.'s Mot. at 1–3]. He raises a similar contention regarding the amount of loss for which he is responsible under § 2B1.1. *See* [*id.* at 2 ("A loss amount . . . higher than $10,000 . . . would have immigration consequences" and "could be catastrophic . . . . I told [my attorneys] to investigate this . . . [b]ut they did not, instead they

insisted I accept the amount for a more favorable sentence.")]. According to Mr. Oboh, his attorneys were ineffective because they did not object to this amount of loss and argue for an amount below $10,000. [*Id.* at 2–3]. He also faults his attorneys for not negotiating a plea agreement that did not expose him to deportation and for assuring him that he would receive a probationary sentence. [*Id.*]. And finally, he claims that his attorneys were ineffective because they failed to "inform" the Court at sentencing that his conviction subjected him to deportation. [*Id.* at 3–4]. Mr. Oboh must prove his allegations of ineffective assistance of counsel by a preponderance of the evidence. *Pough*, 442 F.3d at 964.

### A. Ineffective Assistance of Counsel: Failure to Investigate and to Advise

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right is the right not merely to representation but to *effective* representation. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). When a petitioner like Mr. Oboh challenges his conviction and sentence by raising the specter of ineffective assistance of counsel, he normally can succeed only by satisfying the familiar *Strickland* test—a two-pronged test that requires a showing of deficient performance on counsel's part and prejudice. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). *Strickland*'s two-pronged test applies to an attorney's actions in the guilty-plea context. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) (citations omitted). Indeed, "[c]ounsel's performance is strongly presumed to be effective." *Jones v. Bell*, 801 F.3d 556, 562 (6th Cir. 2015) (alteration in original) (quotation omitted)); *see Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance

after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (citation omitted)); *Thelen v. United States*, 131 F. App'x 61, 63 (6th Cir. 2005) ("A deferential standard of review applies to ineffective assistance claims. A defendant must show that counsel's representation was so 'thoroughly ineffective that defeat was snatched from the jaws of victory.'" (quoting *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996))); *see also Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("[T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." (quoting *Strickland*, 466 U.S. at 689–90)). Even if a particular aspect of counsel's performance proves to be deficient, that deficiency "does not warrant setting aside the judgment of a criminal proceeding" unless it has a prejudicial effect on the judgment. *Strickland*, 466 U.S. at 691 (citation omitted).

1. <u>Deficient Performance</u>

To establish deficient performance, a petitioner must demonstrate that his attorney, through the prism of an objective standard of reasonableness, "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. *Id.* at 687. An attorney's failure to advise his client, "whether a citizen or not," that his guilty plea carries a risk of deportation is objectively unreasonable and constitutes deficient performance. *Padilla*, 559 U.S. at 374. This objectively unreasonable conduct occurs when an attorney "either fails to mention the risk of deportation or specifically discounts such a risk." *Rodriguez-Penton v. United States*, 905 F.3d 481, 487 (6th Cir. 2018) (citing *id.* at 359, 368–69). Mr. Oboh's allegations encompass each of these types of failures on his attorneys' part. *See* [Def.'s Mot. at 1–2 (arguing that his attorneys downplayed the risk of deportation by "reassur[ing] [him] of

11

probation" and saying "there'll be no jail time"); Def.'s Letter at 1 (alleging that his counsel advised him that his conviction "wouldn't result [in] deportation"); Def.'s Addendum at 1 (asserting that his attorneys "told [him] that [he] would not be deported if [he] accept[ed] the plea deal")].

Although "[i]t is quintessentially the duty of counsel to provide [a] client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis,'" *Padilla*, 559 U.S. at 371 (quotation omitted), this duty is not without its demarcations, and the scope of this duty begins with the INA's text. When the text is clear— that is, when an attorney can determine "simply from reading the text of the statute" that a client's plea to a particular offense will carry deportation as a consequence—the "duty to give correct advice is equally clear." *Id.* at 369. When, however, "the deportation consequences of a particular plea are unclear," an attorney "need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* (footnote omitted).

While clarity in the INA's text is necessary to trigger an attorney's duty to advise a client as to whether mandatory deportation will follow a guilty plea, the INA does not always provide that clarity. *See id.* ("There will . . . undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain."). Indeed, in the INA, Congress did not list every one of the crimes under which a defendant, if convicted, would face mandatory deportation. Instead, it compressed these crimes into an umbrella term: "a crime involving moral turpitude," which it did not define. *See Yeremin v. Holder*, 738 F.3d 708, 714 (6th Cir. 2013) ("The term 'crime involving moral turpitude' is not defined in the INA[.]").

This umbrella term is at the crux of Mr. Oboh's claim of ineffective assistance. He contends that the offense to which he pleaded guilty—conspiring to commit bank fraud, money laundering, and aggravated identify theft, in violation of 18 U.S.C. § 371—is a crime of moral turpitude under the INA. [Def.'s Mot. at 3; Def.'s Addendum at 1]. If Mr. Oboh is right, then the issue is whether his attorneys, under an objective standard of reasonableness, should have known or been able to determine that deportation was a mandatory consequence of his guilty plea to this offense. When a guilty plea carries deportation as a mandatory consequence, an attorney has a duty to advise his client that deportation is in fact mandatory, but when a guilty plea does not carry deportation as a mandatory consequence, or when deportation is uncertain, an attorney has a duty to advise his client only that deportation is a possible risk. *Padilla*, 559 U.S. at 368–69.

Again, the pertinent part of the INA, § 1227, states that an alien is deportable if (1) he is convicted of a crime of moral turpitude, (2) within ten years of becoming a lawful permanent resident, and (3) the crime of conviction may result in a sentence longer than a year. 8 U.S.C. § 1227(a)(2)(A)(i). The record unequivocally satisfies the second and third elements. Mr. Oboh became a permanent resident of the United States in 2019, [Gov't Ex. 1-D at 1], and the Court entered its criminal judgment—which he did not appeal—against him in May 2023, so under the second element, his conviction occurred within ten years of his attainment of permanent residency. Under the third element, Mr. Oboh's conviction under 18 U.S.C. § 371 constituted a felony, so by definition it is a crime for which the Court may impose a sentence longer than a year. *Compare* 18 U.S.C. § 3156(a)(3) ("[T]he term 'felony' means an offense punishable by a maximum term of imprisonment of more than one year[.]"), *with* 18 U.S.C. § 371 (authorizing courts to impose a sentence of up to five years).

Now, in reverse order, the Court turns to the first element, which requires an analysis of Mr. Oboh's contention that his conviction constitutes a crime of moral turpitude. If it does, the Court then must address the more salient question: whether Mr. Oboh's attorneys, under an objective standard of reasonableness, should have ascertained as much. Mr. Oboh's conviction is a parcel of one conspiracy with three objects—conspiracy to commit bank fraud, money laundering, and aggravated identify theft—and a guilty plea to any one of these three objects will sustain a conviction under § 371. *United States v. Tragas*, 727 F.3d 610, 616 (6th Cir. 2013); *United States v. Carver*, 470 F.3d 220, 232 (6th Cir. 2006).[6] The Court will begin its analysis with the first object of the conspiracy—a conspiracy to commit bank fraud—and if it determines that it is a crime of moral turpitude, then Mr. Oboh was subject to mandatory deportation, and the Court need not determine whether the conspiracy's other two objects are crimes of moral turpitude or otherwise mandate deportation. In the Court's previous order, in which it addressed whether Mr. Oboh's allegations warranted an evidentiary hearing, the Court preliminarily and perfunctorily expressed its view that Mr. Oboh's conviction for conspiring to commit bank fraud is a crime of moral turpitude and exposed him to mandatory deportation under § 1227. Coming full circle, the Court now reiterates this finding but with the backing of a full analysis.

"[T]he term 'moral turpitude' evades precise definition," Justice Samuel Alito wrote, in a concurring opinion in *Padilla*. 559 U.S. at 377 (Alito, J., concurring) (alteration in original) (quotation omitted))). Again, Congress never defined it in the INA, and the "legislative history does not reveal congressional intent regarding which crimes are turpitudinous." *Amouzadeh v.*

---

[6] Mr. Oboh argues that the charge in Count One is a "3-in-1" charge and is duplicitous, and that it therefore carries further deportation-related consequences for him. [Def.'s Mot. at 3]. Mr. Oboh's argument is fallacious. "A single count of conspiracy to commit several crimes is not duplicitous, because . . . [t]he conspiracy is the crime, and that is one, however diverse its objects." *United States v. Boyd*, 640 F.3d 657, 666 (6th Cir. 2011) (quotation omitted).

14

*Winfrey*, 467 F.3d 451, 454 (5th Cir. 2006). "Instead, Congress left the interpretation of [the term] to both the [Board of Immigration Appeals] and the federal courts." *Id.* (first alteration in original) (footnote omitted) (quotation omitted))). Decades ago, the Supreme Court, in a removal case, defined it as "crimes in which fraud was an ingredient," *Jordan*, 341 U.S. at 232, and much more recently, the Sixth Circuit put forward a similar definition in a removal case, describing crimes of moral turpitude as "[c]rimes that involve deception or fraud," *Yeremin*, 738 F.3d at 714; *see United States v. Lopez*, 75 F.4th 1337, 1344 (11th Cir. 2023) ("Our precedents are instructive. Fraud offenses meet th[e] standard" of a crime involving moral turpitude. (citation omitted)).

To determine whether Mr. Oboh's conviction for conspiring to commit bank fraud fits within the definition of a crime of moral turpitude—that is, whether it is as a crime involving fraud or deception—the Court applies the categorical approach, because § 1227(a)(2)(A)(i) makes a defendant deportable based on the nature of his conviction and not his actual conduct. *Kawashima v. Holder*, 565 U.S. 478, 483 (2012); *see Yeremin*, 738 F.3d at 715 ("In determining whether a conviction under a federal statute fits the . . . definition of a crime involving moral turpitude, we apply . . . the categorical . . . approach[]." (citations omitted)); *Kellermann v. Holder*, 592 F.3d 700, 704 (6th Cir. 2010) ("Under the 'categorical approach' . . . this court must first look to the inherent nature of the crime[] as defined by statute and interpreted by the courts . . . to determine whether [it] [is] one[] involving moral turpitude for the purposes of the deportation statute." (internal quotation mark and quotation omitted)), *abrogated on other grounds by Sellers v. Lynch*, 630 F. App'x 464 (6th Cir. 2015); *see also George v. U.S. Att'y Gen.*, 953 F.3d 1300, 1303 (11th Cir. 2020) ("To determine whether an alien's prior conviction qualifies as an aggravated felony or a crime involving moral turpitude, we apply the categorical

approach." (citations omitted)); *cf. Esquivel-Quintana v. Sessions*, 581 U.S. 385, 389 (2017) ("[T]o determine whether an alien's conviction qualifies as an aggravated felony under [§ 1227(a)(2)(A)(iii)], we 'employ a categorical approach by looking to the statute . . . of conviction, rather than to the specific facts underlying the crime.'" (quoting *Kawashima*, 565 U.S. at 483)).

Under the categorical approach, the Court "look[s] to the statute defining the crime of conviction," *Kawashima*, 565 U.S. at 483, which in this case is 18 U.S.C. § 371, with the aim of ascertaining whether its elements make up a crime of moral turpitude under the INA, *see id.* at 483 ("If the elements of the offense[] establish that the [defendant] committed [a] crime[] involving fraud or deceit, then the . . . [INA] is satisfied." (footnote omitted)); *see Yeremin*, 738 F.3d at 715 ("If the full range of conduct encompassed by the statute constitutes a crime of moral turpitude, then the conviction is for an offense qualifying as a crime involving moral turpitude." (citations omitted)). In other words, the Court determines whether § 371's elements categorically match with or "substantially correspond[] to" a crime of moral turpitude. *Taylor v. United States*, 495 U.S. 575, 602 (1990). If § 371's elements criminalize more conduct than a crime of moral turpitude, then Mr. Oboh's conviction for conspiring to commit bank fraud is broader than a crime of moral turpitude and does not qualify as one. *See Cradler v. United States*, 891 F.3d 659, 667 (6th Cir. 2018) ("Statutes that criminalize more conduct than the generic definition of the offense are sometimes described as being 'broader' than the generic offense, resulting in the use of shorthand monikers for them, including 'overbroad,' 'too-broad,' or 'non-generic' statutes."). If, however, § 371's elements are "the same as, or narrower than" a crime of moral turpitude, then Mr. Oboh's conviction "counts" as a crime of moral turpitude.

*Mathis v. United States*, 579 U.S. 500, 504 (2016). The Sixth Circuit uses a three-step analysis when applying the categorical approach. *Cradler*, 891 F.3d at 667–71.

First, "[t]he [initial] step in applying the categorical approach is to determine whether the statute of conviction 'has a single, indivisible set of elements.'" *Id.* at 668 (quoting *Descamps v. United States*, 570 U.S. 254, 258 (2013)). Section 371 is the federal general conspiracy statute—as distinct from other federal conspiracy statutes that deal with specific types of conspiracies, like the RICO conspiracy statute under 18 U.S.C. § 1962(d)—and it proscribes a conspiracy (1) to commit an offense against the United States or (2) to defraud the United States:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. The statute's first clause is known as the "offense clause," whereas its second clause is known as the "defraud clause." *United States v. Tipton*, 269 F. App'x 551, 555 (6th Cir. 2008). In prosecutions under the defraud clause, the United States must be the target of the conspiracy, *United States v. Tanner*, 483 U.S. 107, 129–32 (1987); *United States v. Minarik*, 875 F.2d 1186, 1191 (6th Cir. 1989), but in prosecutions under the offense clause, the United States need not be the target, *see United States v. Gibson*, 881 F.2d 318, 321 (6th Cir. 1989) ("It has long been established that the words 'offense against the United States' encompass all offenses against the laws of the United States, not just offenses directed at the United States as target or victim." (citations omitted)).

Because § 371 prohibits different kinds of conspiracies, the statute is divisible, and the Court may therefore apply the modified categorical approach. *See Minarik*, 875 F.2d 1186–87

17

("The statute is written in the disjunctive in order to criminalize two categories of conduct: conspiracies to commit offenses specifically defined elsewhere in the federal criminal code, and conspiracies to defraud the United States."); *see also Nemis v. Garland*, No. 21-6151-ag, 2024 WL 1252947, at *1 (2d Cir. Mar. 25, 2024) ("There is no dispute on appeal that § 371 is divisible and that the modified [categorical] approach applies to this case."); *Balkaran v. Att'y Gen. of the U.S.*, 567 F. App'x 106, 108 (3d Cir. 2014) ("The statute under which [the defendant] was convicted, 18 U.S.C. § 371, is a divisible statute, so we may use the modified categorical approach." (citation omitted)); *see generally Mathis*, 579 U.S. at 505 ("A single statute may list elements in the alternative, and thereby define multiple crimes. . . . [A] . . . court thus requires a way of figuring out which of the alternative elements listed . . . was integral to the defendant's conviction . . . . To address that need, this Court approved the 'modified categorical approach[.]'" (citation omitted)).

Under the modified categorical approach, the Court examines "a limited class of documents, (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Mathis*, 579 U.S. at 505–06 (citations omitted); *see also Yeremin*, 738 F.3d at 715 ("The modified-categorical approach involves looking to a limited set of court documents that are part of the record of conviction, including the charging document, plea agreement, and transcript of plea colloquy, to determine whether the specific offense for which the petitioner was convicted qualifies as a crime involving moral turpitude." (citations omitted)). In the indictment against Mr. Oboh, the United States charged him in Count One, the relevant count, with conspiring to commit bank fraud "against the United States." [Indictment at 3]. This language, namely "against the United States," is telling because it matches the language in § 371's offense clause, which criminalizes

18

a conspiracy "to commit any offense *against the United States*," 18 U.S.C. § 371 (emphasis added); *see Wade v. United States*, No. 97 CIV.4439(RWS), 1998 WL 43110, at *7 (S.D.N.Y. Feb. 2, 1998) ("Bank fraud . . . is an offense against the United States, no matter who the ultimate victim may be."). In addition, neither the indictment nor the plea agreement contains allegations or assertions that Mr. Oboh, in Count One, defrauded the United States specifically, and the United States is not among the victims—all of which are financial institutions—that the Court listed in its criminal judgment. [J. at 6–8]. The Court therefore concludes that Mr. Oboh, in pleading guilty to a conspiracy to commit bank fraud under § 371, pleaded guilty to an offense under § 371's offense clause and not its defraud clause.

Second, now that the Court, with the assistance of the modified categorical approach, has identified the crime of conviction, it can identify "which element[s] played a part in [Mr. Oboh's] conviction." *Descamps*, 570 U.S. at 260. The elements of the offense are "critically important" to the Court's analysis because the Court must "determine the full range of conduct that is encompassed by [those] . . . element[s]," *Cradler*, 891 F.3d at 669, so that it can then "line[] up" or compare those elements with a crime of moral turpitude, *Mathis*, 579 U.S. at 505. Under § 371, a conspiracy to commit bank fraud has the following elements: (1) that two or more persons conspired, or agreed, to commit the crime of bank fraud, (2) that the defendant knowingly and voluntarily joined the conspiracy, and (3) that a member of the conspiracy committed an overt act in furtherance of the conspiracy. *United States v. Adeleke*, No. 23-3077, 2024 WL 1134645, at *3 (6th Cir. Mar. 15, 2024); *United States v. Rogers*, 769 F.3d 372, 382 (6th Cir. 2014).[7]

---

[7] Under § 371's defraud clause, a conspiracy to defraud the United States consists of different elements: "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States." *United States v. White,* 492 F.3d 380, 395 (6th Cir.2007) (quotation omitted).

19

For these elements, the full range of conduct encompasses fraudulent intent because the substantive offense, or the object of the conspiracy, requires fraudulent intent. "[C]onspiracy to commit a particular substantive offense *cannot exist* without at least the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States*, 360 U.S. 672, 678 (1959) (alteration in original) (footnote omitted) (internal quotation marks and quotation omitted))); *see United States v. Trevino*, 7 F.4th 414, 425 (6th Cir. 2021) ("The government must prove . . . the conspirators acted with 'at least the degree of criminal intent necessary for the substantive offense' that was the object of the conspiracy." (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975))); *Tragas*, 727 F.3d at 616 ("For defendants charged with conspiracy, the object offense of the conspiracy is an element of the crime." (citation omitted)). In Mr. Oboh's case, the substantive offense is bank fraud,[8] whose elements include fraudulent intent. Those elements are: (1) that the defendant knowingly executed a scheme to defraud a financial institution, (2) that he did so *with the intent to defraud*,[9] and (3) that the FDIC insured the financial institution. *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001).

Having determined that § 371's elements encompass fraudulent intent, the Court must now, under the third and final step of its analysis, compare § 371's elements with a crime of moral turpitude. *Cradler*, 891 F.3d at 670–71. Again, a crime of moral turpitude is a crime that has fraud or deception as an ingredient. *Jordan*, 341 U.S. at 232; *Yeremin*, 738 F.3d at 714. If § 371's elements prohibit more conduct than fraud or deception, then Mr. Oboh's conviction for conspiring to commit bank fraud is broader than a crime of moral turpitude and does not

---

[8] In the indictment, the United States identifies the substantive offense as "bank fraud in violation of 18 U.S.C. § 1344." [Indictment at 3].

[9] "More often," the Sixth Circuit, has "equated 'intent to defraud' with having the 'purpose of causing a financial loss to another or bringing about a financial gain to oneself.'" *United States v. Skouteris*, 51 F.4th 658, 667 (6th Cir. 2022) (quotation and citations omitted).

20

qualify as one. *Cradler*, 891 F.3d at 667. Put another way, if a conspiracy to commit bank fraud "could be committed in a manner that does not involve moral turpitude, then the statute is overbroad—that is to say, it does not 'categorically' involve moral turpitude." *Lopez*, 75 F.4th at 1341.

A defendant can engage in a conspiracy to commit bank fraud *only* in a manner that involves moral turpitude because it requires fraudulent intent as an element of the offense. *Ingram*, 360 U.S. at 678; *Trevino*, 7 F.4th at 425; *Tragas*, 727 F.3d at 616; *see Lopez*, 75 F.4th at 1345 ("A requirement of 'criminal intent' may be informative" in determining whether an offense "necessarily involve[s] fraud" and qualifies as crime of moral turpitude. (quotation and citations omitted)); *see also Yeremin*, 738 F.3d at 714 ("[I]f fraud or deception is inherent in the nature of the offense, then the crime involves moral turpitude." (citation omitted)). Mr. Oboh's conviction for conspiring to commit bank fraud is therefore indisputably, or categorically, a crime that qualifies as a crime of moral turpitude—that is, a crime that has fraud or deception as an ingredient. *Jordan*, 341 U.S. at 232; *Yeremin*, 738 F.3d at 714; *cf. Kellermann*, 592 F.3d at 704–05 (using the categorical approach and holding that a conspiracy to defraud the United States under § 371 constitutes a crime of moral turpitude under the INA); *see Kawashima*, 565 U.S. at 483 ("If the elements of the offense[] establish that the [defendant] committed crimes involving fraud or deceit, then the . . . [INA] is satisfied].").

The more pertinent question, however, is whether a reasonably competent attorney, rather than the Court, should have been able to come to this same conclusion: that Mr. Oboh's conviction qualifies as a crime of moral turpitude *See Davis v. Straub*, 430 F.3d 281, 290 (6th Cir. 2005) ("Constitutionally ineffective assistance of counsel requires . . . that defense counsel's services fell below that of a reasonably competent attorney[.]" (citing *Strickland*, 466

U.S. at 687)). In the United States's view, "this stuff is complicated" and "not as easy as just opening a statute book." [Hr'g Tr. (on file with the Court)]. The United States's view does have a ring of truth to it, and the Court recognizes that while the Constitution guarantees criminal defendants "a competent attorney," "[i]t does not insure that defense counsel [must] recognize and raise every conceivable constitutional claim," *Engle v. Isaac*, 456 U.S. 107, 134 (1982), particularly a claim outside their areas of expertise, *see Padilla*, 559 U.S. at 385 (Alito, J., concurring) ("[R]easonably competent attorneys should know that it is not appropriate or responsible to hold themselves out as authorities on a difficult and complicated subject matter with which they are not familiar."); *Winfield v. Dorethy*, 956 F.3d 442, 461–62 (7th Cir. 2020) ("[The issue] is narrow and winds carefully around many barriers, both factual and legal. It is so complex that we cannot say that all reasonably competent attorneys would spot it.").

Although "[t]h[e] categorical approach has a long pedigree in our Nation's immigration law," *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (citation omitted), it originated "in the criminal context," *Pereida v. Wilkinson*, 592 U.S. 224, 233 (2021); *see Sessions v. Dimaya*, 584 U.S. 148, 224 (2018) (Thomas, J., dissenting) ("The categorical approach originated with Justice Blackmun's opinion for the Court in *Taylor*," in 1990). On the one hand, a criminal defense attorney, therefore, ought to be familiar with it and know how to apply it—particularly now, roughly thirty-five years after its conception. *See Bridges v. United States*, 991 F.3d 793, 805 (7th Cir. 2021) ("The categorical approach may be counterintuitive and artificial, but, like other complex factual and legal inquiries that regularly arise in criminal defense, competent counsel need to understand it and be able to use it." (citing *Hinton v. Alabama*, 571 U.S. 263, 274 (2014)). Indeed, the Sixth Circuit has described the categorical approach as "well-known,"

*United States v. Jackson*, 995 F.3d 476, 479 (6th Cir. 2021) (citations omitted), and a veritable tome of case law exists on the subject.

But on the other hand, federal circuit courts have decried the categorical approach as a model that leads to inconsistent results and defies common sense. *See Bridges*, 991 F.3d at 804 ("[T]he categorical approach frequently produces counterintuitive results and has been the subject of much judicial handwringing." (citation omitted)); *United States v. Scott*, 990 F.3d 94, 126 (2d Cir. 2021) (Park, J., concurring) ("As a growing number of judges across the country have explained, the categorical approach perverts the will of Congress, leads to inconsistent results, wastes judicial resources, and undermines confidence in the administration of justice." (citations omitted)); *Lopez-Aguilar v. Barr*, 948 F.3d 1143, 1149 (9th Cir. 2020) (Graber, J., concurring) ("I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results." (citations omitted)); *United States v. Burris*, 912 F.3d 386, 407 (6th Cir. 2019) (Thapar, J., concurring) ("The time has come to dispose of the long-baffling categorical approach."); *United States v. Davis*, 875 F.3d 592, 595 (11th Cir. 2017) ("So here we go down the rabbit hole again to a realm where we must close our eyes as judges to what we know as men and women. It is a pretend place in which a crime that the defendant committed violently is transformed into a non-violent one . . . . Curiouser and curiouser it has all become, as the holding we must enter in this case shows. Still we are required to follow the rabbit."); *United States v. Reyes-Contreras*, 910 F.3d 169, 186 (5th Cir. 2018) ("The well-intentioned experiment [of the categorical approach] . . . has crashed and burned." (footnote omitted)), *abrogated in part by Borden v. United States*, 593 U.S. 420 (2021); *De Lima v. Sessions*, 867

F.3d 260, 268 (1st Cir. 2017) ("Even a single such categorical analysis is an arduous task" and "is often difficult and time consuming." (citations omitted)); *see also United States v. Taylor*, 596 U.S. 845, 873 (2022) ("In light of the mischief that the categorical approach has caused, we should welcome briefing on whether a conduct-based approach tacks closer to statutory text and common sense[.]" (Thomas, J., dissenting))).

The Court, however, cannot agree that, in *this* case, the categorical approach produces an inconsistent or absurd result or is inordinately difficult for a reasonably competent attorney to apply. From the outside looking in, a layperson in the law would surely be nonplussed to learn that the legal question in this case—whether a conspiracy to commit bank *fraud* constitutes a crime in which *fraud* is an ingredient—is the object of litigation. *Cf. Burris*, 912 F.3d at 407 (Thapar, J., concurring) ("A casual reader . . . might struggle to understand why we are even debating if ramming a vehicle into a police officer is a crime of violence. The reader's struggle would be understandable."). The performance of basic legal research would have revealed to a reasonably competent attorney that the categorical approach is necessary to ascertain whether Mr. Oboh's conviction constitutes a crime of moral turpitude under the INA, *see Yeremin*, 738 F.3d at 715; *Kellermann*, 592 F.3d at 704–05; *cf. Esquivel-Quintana*, 581 U.S. at 389, that the Supreme Court and the Sixth Circuit define a crime of moral turpitude as one in which fraud is an ingredient, *Jordan*, 341 U.S. at 232; *Yeremin*, 738 F.3d at 714, and that the full range of criminal conduct for a conspiracy to commit bank fraud under § 371 encompasses fraudulent intent, *Ingram*, 360 U.S. at 678; *Everett*, 270 F.3d at 989.

And although the categorical approach must "focus on the elements, rather than the facts, of a crime," *Descamps*, 570 U.S. at 263, a mere "peek" at the indictment's allegations and the plea agreement's factual basis should have tipped off a reasonably competent attorney

to the obvious: that fraud was an ingredient of Mr. Oboh's conviction, *Mathis*, 579 U.S. at 518 (quotation omitted). In the indictment, the United States alleged that Mr. Oboh helped create fraudulent bank accounts by impersonating other individuals and providing banks with these individuals' names, dates of births, and social security numbers, [Indictment at 8–9], and the words "fraud," "fraudulent," or "fraudulently" appear fourteen times in the plea agreement's factual basis, [Oboh Plea Agreement at 2–4; *see id.* at 4 ("[D]efendant was also an individual who other participants have identified as being involved with creating fraudulent consumer bank accounts.")]. The parties also agreed that an enhancement was appropriate under § 2B1.1(b)(1), [*id.* at 6], which is "the Guideline used by courts in determining 'loss' for fraud cases," *United States v. Triana*, 468 F.3d 308, 319–20 (6th Cir. 2006) (footnote omitted), and that restitution to the "victim(s)" was appropriate, [Oboh Plea Agreement at 8]; *see United States v. Skouteris*, 51 F.4th 658, 674 (6th Cir. 2022) ("Under the Mandatory Victim Restitution Act, a district court must 'order restitution' from a defendant convicted of certain offenses (including federal bank fraud) 'if an identifiable victim has suffered a loss.'" (quotation and citations omitted)).

In concluding, the Court returns to the Supreme Court's statement in *Padilla*: when the INA's text is clear—that is, when an attorney can deduce "simply from reading the text of the statute" that a client's plea to a particular offense will carry deportation as a consequence—the "duty to give correct advice is equally clear." *Padilla*, 559 U.S. at 368–69. The upshot of this statement, in this Court's view, is that "the deportation consequences of a particular plea" have to be clear before they can trigger an attorney's constitutional duty to advise his client that deportation is mandatory. *Id.* at 369; *see United States v. Freeman*, 679 F. App'x 450, 452 (6th Cir. 2017) ("[W]hen the law lacks clarity, counsel's duty becomes harder to define." (citing *id.* 369)). But clarity can come from other legal sources when the text of a statute is silent. The

25

Court does not read *Padilla* as allowing an attorney simply to give up on providing his client with accurate legal advice when the INA is silent on a term in its text, especially given that the Supreme Court in *Padilla* described deportation as "a particularly severe penalty," *id.* at 365 (internal quotation marks and quotation omitted), and "the equivalent of banishment or exile," *id.* at 374 (quotation omitted); *see Vartelas v. Holder*, 566 U.S. 257, 267–68 (2012) ("We have several times recognized the severity of that sanction [of deportation]." (citing *id.* at 356, 365–66, 373–74)); *Wilson v. Gaetz*, 608 F.3d 347, 352 (7th Cir. 2010) ("Especially because of the severity of the penalty that [defendant] was facing, [his attorney] should have done more[.]"). Indeed, "'[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence,'" *Padilla*, 559 U.S. at 368 (alteration in original) (quotation omitted)), and Mr. Oboh told his attorneys that avoiding deportation was "[o]ne of his biggest concerns," [E-mail, Gov't Ex. 1-C, at 1].

"An attorney's ignorance of a point of law that is fundamental to his case," especially in a complex area like immigration law, does not by itself create a claim of ineffective assistance of counsel, but "*combined* with his failure to perform basic research on that point," it "is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (emphasis added); *see Osagiede v. United States*, 543 F.3d 399, 409 (7th Cir. 2008) ("All lawyers that represent criminal defendants are expected to know the laws applicable to their client's defense," and when "[s]imple computer research would have turned" up those laws, counsel is ineffective for failing to rely on them absent a strategic justification. (quotation omitted)); *see also United States v. Carthorne*, 878 F.3d 458, 469 (4th Cir. 2017) ("[The] presumption [of effective assistance of counsel] is defeated when counsel fails 'to do basic legal research[.]'" (quotation omitted)). Mr. Collins, importantly, testified that

he could not recall a specific point when he researched whether deportation was mandatory for Mr. Oboh under the INA.

Again, in this case, basic legal research would have revealed that courts, in common law, have filled the interstices of the INA by defining a crime of moral turpitude as a crime in which fraud is an ingredient. *Jordan*, 341 U.S. at 232; *Yeremin*, 738 F.3d at 714. Basic legal research would have also revealed, as a matter of legal precedent, that the categorical approach clearly governs the question of whether Mr. Oboh's conviction constitutes a crime of moral turpitude under the INA. *Yeremin*, 738 F.3d at 715; *Kellermann*, 592 F.3d at 704; *cf. Esquivel-Quintana*, 581 U.S. at 389. And basic legal research would have revealed that the full range of criminal conduct for a conspiracy to commit bank fraud under § 371 encompasses fraudulent intent. *Ingram*, 360 U.S. at 678; *Everett*, 270 F.3d at 989.[10]

Although application of the categorical approach can be tricky, the Court is loath even to suggest that criminal defense attorneys who represent defendants in federal district court need not be familiar with it or know how to use it. *See Bridges*, 991 F.3d at 805 ("[C]ompetent counsel need to understand [the categorical approach] and be able to use it." (citing *Hinton*, 571 U.S. at 274)). It has its origins, after all, "in the *criminal* context." *Pereida*, 592 U.S. at 762 (emphasis added). And the Court's insistence that attorneys ought to be able to utilize the categorical approach is not overly demanding in a case like this one, in which the categorical approach yields a predictable result on a question that, some might say, ought to be self-

___

[10] Upon learning that Mr. Oboh's conviction encompasses fraudulent intent, a reasonably competent should have also learned from a plain reading of the INA that Mr. Oboh faced mandatory deportation for the commission of an aggravated felony. *See* 8 U.S.C. § 1101(a)(43)(M)(i) (defining the term "aggravated felony" as "an offense that . . . involves *fraud* or deceit in which the loss to the victim or victims exceeds $10,000" (emphasis added)); *see also* [United States's Notice at 1 n.1 (referring to the parties' agreement to a loss amount ranging between $40,000 and $95,000)].

27

explanatory to a layperson let alone an attorney: whether a conspiracy to commit bank *fraud* constitutes a crime in which *fraud* is an ingredient.

Under the specific facts of this case, the Court concludes that the deportation-related repercussions of Mr. Oboh's guilty plea—namely, mandatory deportation—should have been apparent to a reasonably competent attorney, and Mr. Oboh's attorneys rendered ineffective assistance of counsel under the Sixth Amendment by failing to advise him that deportation was a mandatory consequence of his plea, or at least that mandatory deportation was probable and not just possible. Mr. Oboh's attorneys' deficient performance, however, does not spell victory for Mr. Oboh, who must now show that his attorneys' ineffective assistance prejudiced him.

### 2. Prejudice

To establish prejudice, a petitioner must show that his attorney's alleged deficient performance was so serious that it deprived him of his fundamental right to the due process of law, *Strickland*, 466 U.S. at 687, or in other words, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. In the guilty-plea context, specifically, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. But in "a case like this one—where a criminal defendant risks deportation by pleading guilty and his counsel fails to so advise him—*Hill* does not encompass all the methods of satisfying *Strickland*'s prejudice prong." *Rodriguez-Penton*, 905 F.3d at 489.

In addition to the ways that a petitioner can demonstrate prejudice under *Hill*, he can establish prejudice by showing that, "had he known about the risk of adverse immigration consequences, he would have bargained for a more favorable plea," i.e., one "that d[oes] not

carry adverse immigration consequences." *Id.* at 488 (citation omitted). A petitioner "may make this showing in any number of ways, such as by showing similar plea agreements that were reached by others charged with the same crime." *Id.* at 489 (citing *United States v. Rodriguez-Vega*, 797 F.3d 781, 788 (9th Cir. 2015)); *see Rodriguez-Vega*, 797 F.3d at 788 ("A petitioner may demonstrate that there existed a reasonable probability of negotiating a better plea by identifying cases indicating a willingness by the government to permit defendants charged with the same or a substantially similar crime to plead guilty to a non-removable offense."). In attempting to show prejudice, Mr. Oboh maintains that he "would have rather negotiated a better plea . . . for the purpose of immigration or would have otherwise gone to trial." [Reply at 2]. The Court will now address each of these arguments: (1) that he would have bargained for a more favorable plea deal had he known that deportation was a mandatory consequence of his plea and (2) that but for his attorneys' misadvice, he would not have pleaded guilty and would have insisted on going to trial.

a. *Would Have Bargained for a More Favorable Plea Deal*

Under Mr. Oboh's first argument, he directs the Court's attention to his co-defendant, Efosa Imasuen. [Def.'s Mot. at 3]. Mr. Oboh and Mr. Imasuen each entered guilty pleas before United States Magistrate Judge Cynthia R. Wyrick on the same morning and at the same time. [Minute Entry, Doc. 283, at 1, No. 2:20-CR-00062-4-JRG-CRW; Minute Entry, Doc. 286, at 1, No. 2:20-CR-00062-6-JRG-CRW]. The fact that Mr. Oboh's and Mr. Imasuen's plea hearings took place together, i.e., contemporaneously, is important. *See United States v. Singh*, 95 F.4th 1028, 1034 (6th Cir. 2024) (stating that a petitioner, to show that he would have bargained for a plea that did not compromise his immigration status, must "cite . . . evidence contemporaneous with his plea" because "post hoc assertions . . . aren't enough"). According to Mr. Oboh, Mr.

Imasuen, who is also a citizen of Nigeria and a lawful permanent resident of the United States, [PSR, Doc. 358, ¶¶ 49, 52, No. 2:20-CR-00062-4-JRG-CRW], secured a plea agreement that did not require mandatory deportation even though he was charged with the same offenses as Mr. Oboh, [Def.'s Mot. at 3].

Mr. Imasuen was indeed charged with the same offenses as Mr. Oboh—and more. Like Mr. Oboh, Mr. Imasuen was charged in Counts One, Two, and Three, but unlike Mr. Oboh, he was also charged with separate offenses in Counts Four and Five (bank fraud and aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 1344 and 2), in Counts Fifteen and Sixteen (money laundering, in violation of 18 U.S.C. § 1956(a)), and in Counts Twenty-Five and Twenty-Six (aggravated identity theft and aiding and abetting aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2). [Indictment at 15–23]. In the indictment, the United States viewed Mr. Imasuen as the more culpable defendant in the conspiracy; it ranked him as the fourth most culpable defendant, whereas it ranked Mr. Oboh as the sixth most culpable defendant. In the end, Mr. Oboh and Mr. Imasuen both pleaded guilty to Count One, which, again, was the charge of conspiring to commit bank fraud, money laundering, and aggravated identify theft, in violation of 18 U.S.C. § 371. [Oboh Plea Agreement at 1; Imasuen Plea Agreement, Doc. 270, at 1, No. 2:20-CR-00062-4-JRG-CRW].

But the United States permitted Mr. Imasuen to plead to a fragment of the charge in Count One—a conspiracy to commit money laundering, in violation of § 371, [Imasuen Plea Agreement at 1]—and it acknowledged during the evidentiary hearing that his attorney had "negotiated for just the money laundering object," [Hr'g Tr.]. Of all the defendants in the conspiracy, Mr. Imasuen was the only one to plead guilty to this partial charge, which was, at least facially, benign to his immigration status for two reasons. First, neither a conspiracy to

commit money laundering under § 371 nor the object of the offense—money laundering in violation of 18 U.S.C. § 1956(a), [Indictment at 3]—necessarily involves fraud, *see United States v. Slone*, 43 F. App'x 738, 742 (6th Cir. 2002) (listing the elements of a conspiracy under § 371); *see also United States v. Warshak*, 631 F.3d 266, 317, 319–20 (6th Cir. 2010) (listing the elements of promotional money laundering and concealment money laundering); *cf. Lopez*, 75 F.4th at 1345 (concluding that money laundering under "[§] 1957 does not define a crime of moral turpitude"). Second, a conspiracy to commit money laundering under § 371 is not among the offenses that the INA defines as an aggravated felony, 8 U.S.C. § 1101(a)(43)(A)–(U),[11] and the loss amount to which Mr. Imasuen and the United States agreed—a sum less than $6,500, [Imasuen Plea Agreement at 6]—did not exceed $10,000, *see* 8 U.S.C. § 1101(a)(43)(M)(i) (defining an "aggravated felony" as "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000"). So by allowing Mr. Imasuen to plead guilty to the crime of conspiring to commit money laundering under § 371, the United States, at least ostensibly, allowed him to avoid a conviction that carried deportation as a mandatory penalty,[12] and Mr. Oboh therefore asserts that Mr. Imasuen's "attorney did his due diligence for his client who is also a non-U.S. citizen to avoid further and future immigration consequences" and that his own "attorneys did no such [thing]" for him, [Def.'s Mot. at 3].

The United States now attempts to explain why it allowed Mr. Imasuen to plead to a truncated version of the charge in Count One—which did not include fraudulent conduct and

---

[11] Incidentally, a conspiracy to commit money laundering under 18 U.S.C. § 1956(h) is an aggravated felony and a deportable offense, 8 U.S.C. § 1101(a)(43)(D), (U); *id.* § 1227(a)(2)(A)(iii), but the Court is unaware of any statutory authority that identifies a conspiracy to commit money laundering under § 371 as a deportable offense.

[12] Mr. Imasuen's advisory guidelines range was ten to sixteen months' imprisonment, [Statement of Reasons, Doc. 464, at 1, No. 2:20-CR-00062-4-JRG-CRW]—lower than Mr. Oboh's because, unlike Mr. Oboh, Mr. Imasuen received no enhancement under § 2B1.1. The Court sentenced Mr. Imasuen to two years of probation. [J., Doc. 463, at 2, No. 2:20-CR-00062-4-JRG-CRW]. So even if Mr. Imasuen's conviction did qualify as one of moral turpitude, he was safe from deportation because his sentence did not exceed a year or more. *See* 18 U.S.C. § 1227(a)(2)(A)(i)(I)–(II).

31

therefore did not expose him to the risk of deportation—but did not offer Mr. Oboh the same accommodation. In the United States's view, Mr. Oboh and Mr. Imasuen "are not identically situated." [United States's Resp. at 6]. The United States argues that Mr. Imasuen was only "a runner who withdrew cash from the fraudulently created accounts" and that Mr. Oboh, "by contrast, not only acted as a runner, but also recruited others to do so and helped create some of the fraudulent accounts." [*Id.*]. According to the United States, any contention that it would have permitted Mr. Oboh to enter into a plea agreement that was similar to Mr. Imasuen's is "speculat[ion]." [*Id.*].

In a silo, maybe it is speculation, but alongside the *contemporaneous* evidence in the record, it appears to have substance. Again, Mr. Imasuen, by ranking, was more culpable in the conspiracy than Mr. Oboh, and yet Mr. Imasuen—not Mr. Oboh—received a plea agreement that, on paper, spared him of the collateral consequence of deportation. Under the legal standard that governs prejudice, the seemingly disparate effect that Mr. Oboh's and Mr. Imasuen's plea agreements had on their respective immigration status is evidence of "a willingness by the government to permit [a] defendant[] charged with the same or a substantially similar crime to plead guilty to a non-removable offense." *Rodriguez-Vega*, 797 F.3d at 788; *see Rodriguez-Penton*, 905 F.3d at 489 (recognizing that a petitioner can demonstrate prejudice "by showing similar plea agreements that were reached by others charged with the same crime" (citing *id.*)).

Although Mr. Imasuen's plea agreement may have spared him of deportation on paper, the United States, during the evidentiary hearing, noted that he is now "also getting deported." [Hr'g Tr.]. The United States argues, therefore, that "[it] makes [no] difference that" Mr. Oboh "didn't get the same deal as Imasuen." [*Id.*]. The record, however, is unclear as to why exactly Mr. Imasuen has become involved in deportation proceedings. The United States suggests that

he is awaiting deportation not because of his conviction under § 371 but because he "left the country and came back." [*Id.*]. Mr. Oboh seemed to have the same understanding as the United States, having testified that Mr. Imasuen is "in deportation proceedings because he got arrested at a point of entry at the airport." [*Id.*]. In this same vein, the United States acknowledges that Mr. Imasuen's deportation proceedings, unlike Mr. Oboh's deportation proceedings, are not "governed under [§] 1227" but are "governed under a different section" because Mr. Imasuen "left and reentered" the country. [*Id.*]. The United States also emphasizes that both Mr. Oboh and Mr. Imasuen ultimately pleaded guilty to the same charge—a conspiracy under § 371—so any deportation-related consequences that applied to one, it argues, should have applied to the other. [*Id.*].

Even if Mr. Oboh is correct in arguing that Mr. Imasuen's plea agreement was more favorable than Mr. Oboh's vis-á-vis deportation, Mr. Collins testified that the plea offer that Mr. Oboh accepted was the United States's final offer—a take-it-or-leave-it offer that divested Mr. Collins of license to negotiate further on Mr. Oboh's behalf:

> AUSA Mac Heavener: What did you mean by 'If we plan to proceed toward trial'?
>
> Curt Collins: At that point we were at the end game, as I would call it, with the government. The government had made it very clear that this was our final plea offer and that we could either accept said plea offer or we could proceed to trial, and Mr. Oboh was made fully aware of that, not only in conversations, but obviously in this e-mail as well.

[Hr'g Tr.]. Mr. Collins's testimony serves as "countervailing evidence" against any assertion that Mr. Oboh could have "secured a more favorable plea," *Rodriguez-Penton*, 905 F.3d at 490, and this evidence militates against a finding that Mr. Oboh's "decisionmaking process would have been different if he had been properly advised" that his plea agreement held the risk of mandatory deportation, *id.*

33

In addition, even if Mr. Imasuen's plea agreement did offer more favorable terms on deportation than Mr. Oboh's, the United States maintains that Mr. Oboh "cannot establish any prejudice, because the magistrate judge necessarily ensured, during the plea colloquy, that Oboh was correctly advised of the applicable penalties." [United States's Resp. at 7]. As a general rule, a proper plea colloquy under Federal Rule of Criminal Procedure 11 "cure[s] any misunderstanding [a] defendant may have had about the consequences of the plea," and "the [district] court's proper advisement of rights is thus deemed to 'foreclose' any showing of actual prejudice attributed to counsel's erroneous advice, because the defendant is deemed bound by his statements in response to the court's inquiry." *United States v. Pola*, 703 F. App'x 414, 423 (6th Cir. 2017) (citations omitted)); *see Boyd v. Yukins*, 99 F. App'x 699, 705 (6th Cir. 2004) ("Any misleading information imparted to [the petitioner by her attorney] was remedied by the plea colloquy, which made it clear that she could face a sentence up to and including life imprisonment." (citing *McAdoo v. Elo*, 346 F.3d 159, 171–72 (6th Cir. 2023)); *Ramos v. Rogers*, 170 F.3d 560, 565 (6th Cir. 1999) ("[The] . . . trial court's proper colloquy can be said to have cured any misunderstanding [the petitioner] may have had about the consequences of his plea." (citations omitted)).

During the plea colloquy, Judge Wyrick did not expressly address or ensure Mr. Oboh's understanding of paragraph thirteen of the plea agreement—the paragraph that contained the language that deportation "may be presumptively mandatory," [Oboh Plea Agreement at 10], but she did generically warn him that his guilty plea could result in his deportation, *see* [Plea Hr'g Tr., Gov't Ex. 5-A, at 16:12–13 ("If you are not a United States citizen, the conviction may also cause you to be removed from the United States[.]")]. In response to her warning, Mr. Oboh voiced his understanding and his intention to plead guilty anyway. [*Id.* at 16:16–23].

Judge Wyrick's general warning about the risk of deportation satisfied Rule 11, which requires courts to "inform the defendant of, and determine that the defendant understands," that "if convicted, a defendant who is not a United States citizen may be removed from the United States." Fed. R. Crim. P. 11(b)(1)(O); *see Singh*, 95 F.4th at 1032–33 (rejecting the petitioner's post-conviction claim that the district court violated Rule 11 when it gave a "'generic warning' that pleading guilty 'may' have 'immigration-related consequences'" because "Rule 11 requires only a 'generic warning'" (quotation omitted)).

Mr. Oboh, however, does not allege a violation of Rule 11, and he does not accuse the Court of violating his constitutional rights by not passably advising him that deportation was a direct consequence of his guilty plea—and nor could he. The Court has no *constitutional* obligation to ensure his understanding that his guilty plea could affect his citizenship. *Singh*, 95 F.4th at 1032. His counsel, however, *does* have this constitutional obligation, *Padilla*, 559 U.S. at 374, and because of "[t]he severity of deportation," *id.* at 373, several higher courts have held that—in the face of an attorney's *affirmative misadvice* to his client about his risk of deportation from a guilty plea—a district court's general warning about deportation during the plea colloquy is not curative, *see Lee v. United States*, 582 U.S. 357, 362, 369 (2017) (holding that the petitioner had demonstrated prejudice when his attorney wrongfully advised him that "the government cannot deport you," even though the district court during the plea colloquy had informed the petitioner that "a conviction 'could result in your being deported'"); *United States v. Akinsade*, 686 F.3d 248, 254 (4th Cir. 2012) (holding that the district court's "general and equivocal" warning that the petitioner's plea "*could* lead to deportation" was "insufficient to correct counsel's affirmative misadvice that [the petitioner's] crime was not categorically a deportable offense" (footnote omitted)); *see also Dat v. United States*, 920 F.3d 1192, 1195 (8th

Cir. 2019) (concluding that "counsel's alleged misadvice specifically undermined [the district court's] equivocal warnings" that his conviction "'could affect' his immigration status"); *Doe v. United States*, 915 F.3d 905, 908, 913 (2d Cir. 2019) (determining that the district court did not remedy counsel's misadvice—that deportation was not a mandatory result of the guilty plea—when it asked the defendant if he understood he "may be deported" and did not inform him of the "mandatory consequences" of his plea to an aggravated felony).

The question for the Court, then, is whether the record contains evidence showing that Mr. Oboh's attorneys clouded Judge Wyrick's generic warning by providing Mr. Oboh with affirmative misadvice about his risk of deportation, and the answer is plainly no. All three of Mr. Oboh's attorneys testified, adamantly, that they warned Mr. Oboh that deportation was a possible consequence of his guilty plea, and the Court found their testimonies to be credible in their entireties because they were consistent with one another[13] and with the exhibits that the parties introduced at the hearing. *See Pola v. United States*, 778 F.3d 525, 535 (6th Cir. 2015) ("[D]istrict courts are usually in the best position to determine whether witnesses are credible, when the decision to conduct a § 2255 evidentiary hearing turns on credibility issues[.]" (footnote and quotation omitted)); *see also Neuhard v. United States*, 119 F.4th 1064, 1072–73 (6th Cir. 2024) (stating, in the context of an evidentiary hearing in a § 2255 proceeding, that "we 'give great deference to the district court's credibility determinations'" (quotation omitted)).

Mr. Oboh's credibility, on the other hand, is suspect at best, and contradictions abound between his testimony and his allegations, and between his testimony and the record as a whole. For example, during Judge Wyrick's colloquy, Mr. Oboh stated—while under oath—that he had read the plea agreement, discussed it with his attorneys, and understood all its terms, [Plea

---

[13] Mr. Oboh invoked the rule of sequestration during the evidentiary hearing, so none of his attorneys were present in the courtroom at the same time.

Hr'g Tr. at 9:15–24],[14] yet during the evidentiary hearing, he testified that he and his attorneys "never really discussed [paragraph thirteen]," [Hr'g Tr.].[15] And despite testifying that he and his attorneys never discussed paragraph thirteen, he testified that they affirmatively misadvised him about paragraph thirteen by telling him the opposite of what it says. [*Id.*]. Both cannot be true; silence and affirmative misadvice are diametrically different things. In addition, although he blames his attorneys for affirmatively misadvising him about the risk of deportation, *see* [Def.'s Letter at 1 (contending that his attorneys advised him that his plea "wouldn't result [in] deportation"); Def.'s Addendum at 1 (asserting that his attorneys "told [him] that [he] would not be deported if [he] accept[ed] the plea")], he testified that he had read paragraph thirteen and knew it meant that deportation was, as that paragraph says, presumptively mandatory:

> AUSA Mac Heavener: Okay. And when you read [paragraph thirteen], did you understand exactly what it says?
>
> Mr. Oboh: Yes, sir.
>
> AUSA Mac Heavener: Okay. So you understood that pleading guilty could have consequences to your immigration?
>
> Mr. Oboh: Yes, sir.

[Hr'g Tr.]. In short, the Court does not believe Mr. Oboh's testimony or allegation that his attorneys told him that his guilty plea would, affirmatively, not result in his deportation. His attorneys testified that they advised him that deportation was possible, and the Court credits their testimonies over Mr. Oboh's.

---

[14] Mr. Oboh testified that his native language is English, and Mr. Collins described him as "very intelligent." [Hr'g Tr.]. He holds a bachelor's degree in computer science, as well as a master's degree in engineering technology from East Tennessee State University. [PSR ¶ 58].

[15] Mr. Collins refuted this testimony with his own testimony: "Q. And as part of your counsel with him did you go over paragraph thirteen in the plea agreement says that there may be adverse immigration consequences? A. Yes. Q. And when you told him about paragraph thirteen, did you ever tell him, you can just ignore that because you're going to get probation and the prosecutor is not going to deport you? A. Absolutely not." [Hr'g Tr.].

But even if his attorneys did not advise him that deportation was a possible risk of his guilty plea, Judge Wyrick's generic warning to this effect was curative, given the absence of any credible evidence of affirmative misadvice from Mr. Oboh's attorneys. *Pola*, 703 F. App'x at 423; *Boyd*, 99 F. App'x at 705. Mr. Oboh's sworn statements in response to Judge Wyrick's colloquy—that he had read his plea agreement, discussed it with his attorneys, understood its terms, and wished to plead guilty despite Judge Wyrick's warning that his plea could result in his removal—are "[s]olemn declarations in open court." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). They "carry a strong presumption of verity," and they "constitute a formidable barrier in any subsequent collateral proceeding." *Id.*; *see Marks v. Davis*, 504 F. App'x 383, 386 (6th Cir. 2012) (recognizing "the plea transcript itself carries great weight" (citing *id.*)); *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) ("[W]here the court has scrupulously followed the required procedure [during a plea colloquy], 'the defendant is bound by his statements in response to that court's inquiry.'" (quotation omitted)). In fact, "the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." *United States v. Timmreck*, 441 U.S. 780, 784 (1979).

Mr. Oboh marshals no persuasive argument or evidence to convince the Court that he should not remain bound by his sworn statements during his change-of-plea hearing. In fact, his testimony that his attorneys never discussed paragraph thirteen with him ushers him perilously close to perjury when the Court considers his sworn statements that he and his attorneys had discussed his plea agreement, that he understood its terms, and that he wished to plead guilty despite the risk of deportation. *See United States v. Vargas-Gutierrez*, 464 F. App'x 492, 496 (6th Cir. 2012) ("A motion that can succeed only if the defendant committed perjury at the plea

proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction." (quoting *United States v. Shah*, 453 F.3d 520, 523 (D.C. Cir. 2006))).

Mr. Oboh has no compelling explanation for the contradictions in his testimony. He claims that he thought Judge Wyrick's plea colloquy and warning about deportation were just "standard verbiage" and did not faze him because his attorneys "assured [him]" that his plea "wouldn't lead to . . . deportation." [Def.'s Reply at 1]. But again, the record lacks credible evidence that Mr. Oboh's attorneys assured him that his guilty plea could not lead to his deportation, and any reasonable defendant in his shoes would have spoken up if his attorneys had told him one thing about deportation and a federal judge, in open court during a sworn proceeding, had told him another. *See Lee*, 582 U.S. at 369 ("When the [district] judge warned [the defendant] that a conviction 'could result in [his] being deported,' and asked '[d]oes that at all affect your decision about whether you want to plead guilty or not,' [the defendant] answered 'Yes, Your Honor," and he "turned to his attorney for advice." (fourth alteration in original)); *see also* [Hr'g Tr. (containing the United States's argument that Mr. Oboh "never at one point said, 'You know what, wait, this is, I'm going to get deported? No, I don't want to do this.'").

In sum, although Mr. Oboh's attorneys were ineffective for failing to advise him that deportation was a mandatory consequence of his guilty plea, Mr. Oboh cannot show that their ineffective assistance prejudiced him. Because Judge Wyrick warned him that deportation was possible during the plea colloquy, Mr. Oboh can demonstrate prejudice only with evidence that his attorneys affirmatively misadvised him that his guilty plea would not result in deportation. The record contains no such evidence. Mr. Oboh's claim therefore stalls under the *Strickland*'s second prong.

###### b. *Would Have Insisted on Going to Trial*

Next, Mr. Oboh endeavors to establish prejudice with another argument: that he "would have otherwise gone to trial" rather than accept a plea agreement that required his deportation. [Def.'s Reply at 2]. With this argument, Mr. Oboh must establish that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. "The test is objective, not subjective; and thus, 'to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.'" *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012) (quoting *Padilla*, 559 U.S. at 372).

Mr. Oboh makes several assertions in his pleadings to try to convince the Court that he would have opted for trial if he had known that his plea agreement would trigger mandatory deportation. "Family to me is not one important thing, it's everything so why would I willingly sign a document to be separated from my beautiful toddler kids, loving wife . . . and not giving it my best shot at trial or negotiating a better deal that secures my continuous stay in the United States with my family?" [Def.'s Reply at 2]. "[W]hy would I sell my vehicle, empty my family savings to make a full payment of $40,000[?] . . . [I]f I had any inclination that I would be deported, why wouldn't I just serve my prison time and be deported leaving my possessions for my wife and kids?" [*Id.* at 4].[16] But in assessing the rationality of a defendant's allegation that, if not for his attorney's deficiencies, he would have rejected a plea in favor of trial, the Court examines the "contemporaneous evidence" of "a defendant's expressed preferences," not "*post*

---

[16] At sentencing, Mr. Oboh's attorneys stated that Mr. Oboh paid the restitution in full partly so he could argue for a more lenient sentence, [Sen't Hr'g Tr. at 19:12–17], and Mr. Oboh's attorneys made the same statement during the evidentiary hearing, [Hr'g Tr.].

*hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee*, 582 U.S. at 369.

When mandatory deportation is a consequence of a guilty plea, the Supreme Court has endorsed the use of multiple factors to aid courts in ascertaining whether the defendant has demonstrated a reasonable probability that he would have chosen trial over a guilty plea. In *Lee*, the Supreme Court addressed an attorney's deficient performance that is comparable to the deficient performance here in Mr. Oboh's case: "[b]ut for his attorney's incompetence, [the defendant] would have known that accepting the plea agreement would *certainly* lead to deportation." *Id.* at 371. In determining whether the defendant had suffered prejudice from his attorney's ineffectiveness, the Supreme Court had to decide whether he could demonstrate a reasonable probability that, if his attorney had properly advised him about the certainty of deportation, he would have opted for trial. *Id.* at 365, 369–71. The Supreme Court held that the defendant had "adequately demonstrated a reasonable probability that he would have rejected the plea had he known that it would lead to mandatory deportation," *id.* at 369, and it identified four considerations that were relevant to its holding and that were "backed by substantial and uncontroverted evidence" in the record, *id.* at 371: (1) whether the defendant is likely to succeed at trial, *id.* at 367, (2) whether the defendant placed "paramount importance . . . on avoiding deportation," *id.* at 370, (3) whether the defendant has "strong connections" to the United States and "no other" country, *id.* at 371, and (4) whether a guilty verdict at trial would have had "markedly harsher" consequences for the defendant than a guilty plea, *id.*

The United States urges the Court to apply *Lee*'s four considerations to Mr. Oboh's case and conclude that they do not add up to a reasonable probability that he would have resolved to face trial rather than plead guilty. First, the United States argues that Mr. Oboh was unlikely

41

to succeed at trial because the evidence against him was "very strong" and consisted of audio and visual recordings, cellphone location data, cooperating witnesses who would have testified against him, and a "grand jury transcript in which he admits all these crimes." [Hr'g Tr.].[17] Mr. Oboh's attorneys also viewed the evidence against him as damning, and upon reviewing it, they immediately counseled him ███████████████████████████████. [*Id.*]. Mr. Oboh followed his attorneys' advice: ████████████████████████████. [*Id.*].

Second, the United States contends that the evidence is mixed as to whether Mr. Oboh placed paramount importance on avoiding deportation. On the one hand, the contemporaneous evidence shows that Mr. Collins—in an e-mail to Assistant United States Attorney Mac D. Heavener—wrote that "[o]ne of [Mr. Oboh's] biggest concerns about any type of conviction is his potential deportation away from his family." [E-mail, Gov't Ex. 1-C, at 1]. But on the other hand, as the United States points out, Mr. Oboh elected to plead guilty despite his knowledge, from paragraph thirteen, that deportation was presumptively mandatory and despite Judge Wyrick's warning that deportation was possible. [Hr'g Tr.].

Third, while the United States acknowledges that Mr. Oboh's wife and children are his "primary connections" to the United States and are a "compelling factor" in weighing his ties to the United States, it also highlights his numerous connections to his native Nigeria. [*Id.*]. Those connections include "a load of family," the fact that he "was educated and worked in Nigeria," and the fact that he has remained in contact with a pastor there. [*Id.*]. In addition, the United States observes that four of the eight letters that Mr. Oboh submitted to the Court before sentencing were from individuals in Nigeria. [*Id.*].

---

[17] ████████████████████████████████████████████████. [*Id.*].

And fourth, the United States asserts that a guilty verdict at trial would have had more severe consequences for Mr. Oboh than a guilty plea. The United States underscores one of the significant benefits that Mr. Oboh received from the plea agreement: the dismissal of the other charges against him, namely the charges of conspiring to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349 (Count Two), and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(a) and (h) (Count Three). [*Id.*]. If a jury had convicted him of all charges at trial—and again, the evidence against Mr. Oboh made his prospects grim for an acquittal— Mr. Oboh "was looking at nearly three times the amount of time he was sentenced to," and he "would have had the same likelihood of deportation because the facts aren't going to change." [*Id.*].[18] Restitution could have also been higher if Mr. Oboh had declined the plea agreement in pursuit of trial, the United States points out. [*Id.*]. Mr. Oboh would have also likely surrendered his two-level reduction for acceptance of responsibility under USSG § 3E1.1, without which his guidelines range would have increased. *See* U.S. Sent'g Guidelines Manual § 3E1.1 cmt. n.2 (recognizing that when a defendant proceeds to trial, he may demonstrate acceptance of responsibility only "[i]n *rare* situations" (emphasis added)); *see also United States v. Theunick*, 651 F.3d 578, 588 (6th Cir. 2011) ("In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." (quoting U.S. Sent'g Guidelines Manual § 3E1.1 cmt. n.2)).

The United States's arguments under *Lee* are deft and persuasive—if the Court assumes that *Lee* applies to Mr. Oboh's case. The Court is of the conviction, though, that *Lee* is factually distinct from Mr. Oboh's case and that an analysis under *Lee* is unnecessary, if not incongruous

---

[18] The United States raised a similar argument in *Lee*, and the Supreme Court rejected it. *See Lee*, 582 U.S. at 366 ("The Government responds that, since [the defendant] had no viable defense at trial, he would almost certainly have lost and found himself still subject to deportation, with a lengthier prison sentence to boot.").

43

with Mr. Oboh's case. The Supreme Court described *Lee* as a case of "unusual circumstances." *Lee*, 582 U.S. at 369. In *Lee*, the defendant's conviction under 21 U.S.C. § 841, the Controlled Substances Act, meant that he was subject to mandatory deportation under the INA, but his attorney had affirmatively misadvised him that he would not face deportation if he pleaded guilty. *Id.* at 360–62. The defendant accepted his attorney's advice, but during the change-of-plea hearing, the district judge warned the defendant that his conviction could in fact result in his deportation and asked him if the risk of deportation affected his decision to plead guilty. *Id.* at 369. The defendant responded, "Yes, Your Honor," and then he said, "I don't understand." *Id.* When he turned to his attorney for advice, his attorney dismissed the district judge's warning as a "standard warning," and the defendant went on to plead guilty, only to learn later that he was subject to mandatory deportation because of his conviction. *Id.* (footnote omitted).

The Supreme Court stated that "the present case involves a claim of ineffectiveness of counsel extending to advice *specifically undermining* the judge's warnings themselves" during the plea colloquy. *Id.* at 369 n.4 (emphasis added). Although the district judge's warnings did not "cure[] any prejudice" because the defendant's attorney had subverted them, the Supreme Court recognized that "[s]everal courts," including the Sixth Circuit, "have noted that a judge's warnings at a plea colloquy may undermine a claim that the defendant was prejudiced by his attorney's misadvice." *Id.* (citing *Boyd*, 99 F. App'x at 705). Judge Wyrick's warning to Mr. Oboh during the plea colloquy does exactly that to his claim of prejudice. Again, Mr. Oboh's attorneys did not affirmatively misadvise him about the danger of deportation; instead, they warned him of it. And the record contains not a speck of evidence that they undermined Judge Wyrick's warning about the risk of deportation during the plea colloquy.

44

Unlike the defendant in *Lee*, Mr. Oboh—whose first language is English and who is, by all accounts, an intelligent, well-educated individual—expressed his understanding of that warning and his desire to plead guilty despite it. [Plea Hr'g Tr. at 16:12–13; 16:16–23]. And he chose to plead guilty despite not only Judge Wyrick's warning but also despite the warning in paragraph thirteen of his plea agreement:

> 13. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. ***(Indeed, because the defendant is pleading guilty to conspiracy to commit bank fraud and aggravated identity theft, removal may be presumptively mandatory.)*** Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of the defendant's conviction on immigration status. ***The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences the plea may entail, even if the consequence is automatic removal from the United States.***

[Oboh Plea Agreement at 10–11 (emphasis added)]. Mr. Oboh, by his own admission during the evidentiary hearing, went into the change-of-plea hearing with eyes wide open as to this warning in paragraph thirteen, having conceded that he had read paragraph thirteen and knew it meant that pleading guilty carried a presumptive risk of deportation. He pleaded guilty anyway.

So, in sum, without evidence that Mr. Oboh's attorneys counseled him to reject Judge Wyrick's warning, or evidence that they *affirmatively misadvised* him that the danger of deportation was non-existent, Judge Wyrick's warning—especially alongside Mr. Oboh's testimony that he pleaded guilty despite his awareness that deportation was presumptively mandatory—remedied any prejudice from their failure to inform him that deportation was mandatory. *See Cedeno-Gonzalez v. United States*, 757 F. App'x 868, 870 (11th Cir. 2018) (holding that the petitioner could not show a reasonable probability that he would have insisted

on going to trial rather than plead guilty because any deficient performance "was cured" by the plea agreement's "specific paragraph explaining the possible immigration consequences of the plea" and the petitioner's assurances that "he understood the immigration consequences of the plea" during the plea colloquy); *cf. Swain v. United States*, 155 F. App'x 827, 831–32 (6th Cir. 2005) (determining that the petitioner's attorney was ineffective but that the petitioner could not show a reasonable probability that she would have rejected the plea partly because she had declined to withdraw her plea after "the district judge corrected counsel's understanding of the law in open court" during the plea colloquy); *United States v. Alexis*, No. 5:13-69-DCR, No. 5:16-38-DCR, 2016 WL 3004644, at *4 (E.D. Ky. May 24, 2016) ("With such an extensive colloquy, any misunderstanding engendered by defense counsel's alleged promise was cured. As a result, [the petitioner] cannot establish a reasonable probability that, but for his counsel's alleged [deficient performance], he would not have pleaded guilty." (citing *Ramos*, 170 F.3d at 565)). Mr. Oboh therefore fails to establish that his attorneys' deficient performance was so serious that it deprived him of his fundamental right to a fair outcome in his criminal case, *see Strickland*, 466 U.S. at 687, and his claim of ineffective assistance of counsel falters under *Strickland*'s second prong.

## B. Ineffective Assistance of Counsel: Failure to Object to the Loss Amount

Next, Mr. Oboh argues that his attorneys were ineffective for their "failure to object" to the amount of loss for which he is responsible under USSG § 2B1.1. *See* [Def.'s Mot. at 2 ("A loss amount . . . higher than $10,000 . . . would have immigration consequences" and "could be catastrophic . . . . I told [my attorneys] to investigate this . . . [b]ut they did not, instead they insisted I accept the amount for a more favorable sentence.")]. In response, the United States

contends that Mr. Oboh "has not identified any legal basis upon which his attorney could have sought a lesser amount." [United States's Resp. at 10].

The mere fact that a loss amount over $10,000 could have "immigration consequences" does not mean that Mr. Oboh's attorneys had a *duty* to object to that amount without having a legal or factual basis to do so. *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("[T]o . . . impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy[.]"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (stating that "the Sixth Amendment guarantees reasonable competence, not perfect litigation" (citation omitted)). Mr. Oboh identifies no grounds by which his attorneys, under § 2B1.1, could have in good faith argued for a loss amount below $10,000. *See Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) ("Counsel could not be unconstitutionally ineffective for failing to raise [a] meritless argument."); *see also Brown v. United States*, No. 20-6206, 2021 WL 1561481, at *2 (6th Cir. Mar. 31, 2021) (stating that "counsel cannot be deemed ineffective for failing to file a meritless motion" (citing *Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010))).

Instead, he makes a general assertion that "[o]ne would expect that a reliable attorney would negotiate the lowest possible amount," [Def.'s Reply at 3], but he conceded in his plea agreement that he was responsible for an actual-loss amount as high as $150,000, [Oboh Plea Agreement at 6]. Despite this concession, his attorneys went on to shrewdly and zealously advocate for a significantly lesser amount between $40,000 and $95,000, reducing his exposure under the Guidelines in the process. This range was, by both parties' estimates, "conservative." [United States's Notice at 1 n.1]. The record contains no evidence that Mr. Oboh's attorneys did not advocate for the lowest possible amount of loss under § 2B1.1.

In the absence of substantive allegations that cast a pall of unreasonableness over their decision not to argue for a loss amount below $10,000, the Court will not, and cannot, "second-guess" their advocacy as to the loss amount under § 2B1.1. *Strickland*, 466 U.S. at 689; *see id.* ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (citation omitted)); *Jones*, 801 F.3d at 562 (acknowledging that "[c]ounsel's performance is strongly presumed to be effective" (alteration in original) (quotation omitted))). "[O]nly when ignored issues are *clearly stronger* than those presented, will the presumption of effective assistance of counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (emphasis added) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Again, though, Mr. Oboh makes no meaningful attempt to address whether—and how—an argument for a loss amount below $10,000 would have been stronger than an argument for a loss amount between $40,000 and $95,000. The presumption of effective assistance therefore controls his attorneys' advocacy as to the loss amount, and Mr. Oboh fails to establish deficient performance by a preponderance of the evidence.

But even if Mr. Oboh could establish that his attorneys performed deficiently by failing to secure a loss amount below $10,000, he cannot show prejudice unless he can demonstrate that the loss amount would have had more than "some conceivable effect on" his immigration status. *Strickland*, 466 U.S. at 693. He cannot make this showing because the Court's finding of actual loss, as the United States correctly argues, does not bind the immigration court, before which Mr. Oboh is free to claim that he is responsible for a loss amount below $10,000. *See Al-Adily v. Garland*, 63 F.4th 1065, 1069 (6th Cir. 2023) ("[T]he record of conviction is an

48

uncertain source of reliable information on loss to the victim," and "[t]his is so because '[t]he information generated on loss is routinely done for sentencing purposes, not for "conviction" purposes, and may have been assessed against a "preponderance of the evidence" standard.'" (second alteration in original) (quotation omitted))); *Shogbuyi v. Garland*, 859 F. App'x 304, 307 (10th Cir. 2021) ("The [immigration court] was not required to treat the PSR's assessment of no loss as determinative.").

The Court's loss amount could conceivably result in Mr. Oboh's deportation, but it also could conceivably not result in his deportation, and any argument as to prejudice based on the loss amount is, therefore, too speculative. *See Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."); *see also Nijhawan v. Holder*, 557 U.S. 29, 42 (2009) ("[A] petitioner . . . h[as] at least one and possibly two opportunities to contest the amount of loss, the first at the earlier sentencing and the second at the deportation hearing itself. . . . [S]ince the Government must show the amount of loss by clear and convincing evidence, uncertainties caused by the passage of time are likely to count in the alien's favor."). Mr. Oboh's claim therefore is without merit, not only because Mr. Oboh fails to show that his attorneys acted deficiently but also because he fails to establish prejudice.

### C. Ineffective Assistance of Counsel: Failure to Negotiate a Better Plea Deal

Mr. Oboh goes on to fault his attorneys for failing to negotiate a better plea deal—one that, presumably, did not expose him to deportation and that, maybe, resembled Mr. Imasuen's plea agreement. [Def.'s Mot. at 3]. In response, the United States asserts that Mr. Oboh's claim is meritless because he "speculates" that his attorneys could have negotiated a better plea deal and that the United States would have "acquiesced" to one. [United States's Resp. at 6].

"The art of negotiation is at least as nuanced as the art of trial advocacy," *Premo v. Moore*, 562 U.S. 115, 125 (2011), and as with matters of trial advocacy, an attorney's plea-bargaining methods are therefore entitled to the presumption of effective assistance of counsel, *see United States v. Hurley*, 10 F. App'x 257, 260 (6th Cir. 2001) ("The tactical decisions of trial counsel are particularly difficult to attack, and a defendant's challenge to such decisions must overcome a presumption that the challenged action might be considered sound trial strategy." (citation omitted)). In the first instance, a defense attorney does not have a duty to negotiate a plea agreement that is free of deportation-related consequences or, for that matter, a duty to negotiate a plea agreement of any kind, because the United States is under no obligation to engage a defense attorney in plea negotiations at all. *See Weatherford v. Bursey*, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."). But "when the Government chooses to enter into plea negotiations, the Constitution requires that defendants receive effective assistance in navigating that crucial process." *Rodriguez-Penton*, 905 F.3d at 489 (citation omitted).

The evidence of the negotiations between Mr. Oboh's attorneys and the United States provides the Court with no basis to disturb the presumption of effective assistance of counsel. Again, Mr. Collins testified that the plea offer that Mr. Oboh accepted was the United States's final offer. His testimony serves as "countervailing evidence" against any assertion that Mr. Oboh could have "secured a more favorable plea," and it forecloses Mr. Oboh's argument that his attorneys were ineffective for failing to broker a better plea deal. *Id.* at 490. And for the reasons that the Court has already articulated, Mr. Oboh cannot show prejudice either in the traditional way under *Hill* or in any alternative way. Again, Judge Wyrick's plea colloquy cured any prejudice, given the absence of affirmative misadvice from Mr. Oboh's attorneys. Mr.

50

Oboh's claim that his attorneys were ineffective for failing to negotiate a better plea agreement therefore fails.

### D. Ineffective Assistance of Counsel: Promise of a Probationary Sentence

Next, Mr. Oboh alleges that his attorneys rendered ineffective assistance of counsel by reassuring him of a probationary sentence if he signed the plea agreement. [Def.'s Mot. at 1, 2, 3–4]. In every criminal case, the Court has an "independent obligation" to fashion "'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing," *Freeman v. United States*, 564 U.S. 522, 529 (2011) (quoting 18 U.S.C. § 3553(a)), and if an attorney advises his client that he will receive a particular sentence, that advice can constitute ineffective assistance of counsel, *see Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986) ("Though a mere inaccurate prediction, standing alone, would not constitute ineffective assistance . . . [a] gross mischaracterization of the likely outcome . . . falls below the level of competence required of defense attorneys." (internal citations omitted)); *Mosher v. Lavallee*, 491 F.2d 1346, 1348 (2d Cir. 1974) (concluding that the petitioner's plea "must be vacated" because his attorney had falsely promised him a minimum sentence); *Wellnitz v. Page*, 420 F.2d 935, 936 (10th Cir. 1970) ("Certainly, if an attorney recklessly promises his client that a specific sentence will follow upon a guilty plea, or otherwise unfairly holds out an assurance of leniency in exchange for a confession of guilt, the question may arise whether such assurances were coercive, or whether such representation may be deemed constitutionally ineffective." (citation omitted)).

In *Blackledge v. Allison*, 431 U.S. 63 (1977), a petitioner claimed that his attorney had promised him a maximum sentence of ten years, but the district court in fact sentenced him to seventeen to twenty-one years, *id.* at 67. The Supreme Court determined that the petitioner's allegations were specific enough to warrant an evidentiary hearing because he had pleaded

51

"exactly what the terms of the promise were; when, where, and by whom the promise had been made; and the identity of one witness to its communication." *Id.* at 76. Unlike the petitioner in *Blackledge*, Mr. Oboh alleges no specifics as to when, where, and from which of his attorneys he had received the promise of probation. During the evidentiary hearing, he mustered some details in support of his claim, testifying that Mr. Collins was the attorney who promised him that he would receive probation and that Mr. Collins made this promise to him in a meeting.

But all three of Mr. Oboh's attorneys, including Mr. Collins, strenuously denied that they assured Mr. Oboh that he would receive a probationary sentence. Mr. Collins testified that he always "take[s] the worst case scenario approach," which means that he advises his clients of the worst possible sentence they could receive when they sign a plea deal. [Hr'g Tr.]. Mr. Collins testified that either he or Mr. Shelton had provided Mr. Oboh with a document showing him that his worst-case scenario was thirty-seven to forty-six months' imprisonment. [*Id.*; *see* Gov't Ex. 1-F at 3 ("[P]lease review this [plea agreement] in detail and work on a potential guideline range with enhancements. Let's take the worst case scenario approach and not be conservative.")]. Mr. Oboh, who acknowledged receipt of this document, could offer no good explanation for why he was persisting in his claim that his attorneys had promised him a probationary sentence:

> AUSA Mac Heavener. All right. Why would your attorney send you this estimate if they're telling you you're going to get probation if you signed the plea agreement?
>
> . . . .
>
> Mr. Oboh: They sent this to me—I believe this was sent while they were just trying to work something out, and they said the ultimate—that pretty much—I mean, how do I explain this now? So this was sent just like, like I said, guesstimate or just like a rough sketch of what was going on.

52

[Hr'g Tr.]. The evidence of Mr. Collins's estimate exposes one of many credibility issues with Mr. Oboh and his testimony, and it adds up to a preponderance of evidence against him. Mr. Collins's testimony, alongside the evidence that he provided Mr. Oboh with an estimate of a sentence that could include prison time—an estimate that Mr. Oboh acknowledged that he had received—defeats Mr. Oboh's claim that his attorneys guaranteed him a probationary sentence.

Even if Mr. Oboh's attorneys had told him that he would receive probation, his claim would still fail because, as the United States correctly argues, Judge Wyrick's plea colloquy cured any prejudice. During Judge Wyrick's colloquy, Mr. Oboh stated—while under oath— that no one had made any promise or assurance to him to coerce him into accepting the plea agreement. [Plea Hr'g Tr. at 9:25; 10:1–3]. In addition, Judge Wyrick cautioned him that the penalty for his offense could include prison time of up to five years and that the Court could impose a sentence that exceeded any estimate from his attorneys. [*Id.* at 15:9–13; 18:17–21]. Mr. Oboh expressed his understanding that his sentence could require him to serve prison time and that the Court could impose a sentence different from any estimate that his attorneys had communicated to him. [*Id.* at 15:17–19; 18:17–21]. He "is bound by his [sworn] statements in response to" Judge Wyrick's plea colloquy, *Baker*, 781 F.2d at 90 (quotation omitted), and they foreclose any showing of prejudice that may have accompanied his allegation that his attorneys assured him of probation, *see United States v. Ellens*, 43 F. App'x 746, 750 (6th Cir. 2002) ("[The petitioner] obviously cannot show prejudice here. [He] admittedly having been aware, before entering into the plea agreement, of the problem about which he now complains, we cannot say that his plea was anything other than knowing and voluntary."). Mr. Oboh therefore fails to satisfy *Strickland*'s two-part test.

53

### E.  Ineffective Assistance of Counsel: Failure to Inform the Court

And finally, Mr. Oboh claims that his attorneys were ineffective because they failed to "inform" the Court at sentencing that his conviction subjected him to deportation. [Def.'s Mot. at 3–4]. The gestalt of this claim is that the Court would have, or could have, viewed the penalty of deportation as a mitigating factor that warranted a variance and imposed a sentence of less than a year. The Court has the authority to consider the possibility of a defendant's deportation as a mitigating factor, or as an aggravating factor, when arriving at an appropriate sentence. *See United States v. Perez-Garcia*, 191 F. App'x 389, 392 (6th Cir. 2006) (observing that the district court, when it explained it reasons for imposing the defendant's sentence, considered his deportations and his family circumstances); *see also United States v. Tillett*, 269 F. App'x 792, 797 (10th Cir. 2008) (noting the district court's authority to balance a defendant's "family circumstances" and "future deportation" when  weighing "other sentencing variables under § 3553(a)").

The Court begins by acknowledging that Mr. Oboh's attorneys did in fact move for a variance at sentencing, and they argued that he was entitled to a variance based on his history and characteristics and acceptance of responsibility. [Def.'s Sent'g Mem., Doc. 394, at 6–9, No. 2:20-CR-00062-6-JRG-CRW; Sen't Hr'g Tr. at 23:16–17]. Mr. Oboh makes no effort to show that this particular argument for a variance was inferior to an argument for a variance based on his risk of deportation, and he therefore fails to demonstrate that his attorneys acted deficiently. *See Monzo*, 281 F.3d at 579 ("[O]nly when ignored issues are *clearly stronger* than those presented, will the presumption of effective assistance of counsel be overcome." (emphasis added) (quotation omitted))).

Even if Mr. Oboh's attorneys did perform deficiently by failing to move for a variance based on his risk of deportation, he cannot show prejudice because the Court was clearly aware that he faced this risk at sentencing. Indeed, the Court broached that risk during his sentencing hearing by instructing him "not [to] reenter the United States without the permission of the Attorney General or the Secretary of the Department of Homeland Security." [Sent'g Hr'g Tr. at 53:4–7, No. 2:20-CR-00006-2-JRG-CRW]. With the knowledge that deportation was a risk for Mr. Oboh, the Court determined that a sentence greater than a year was, nevertheless, the appropriate sentence, and he therefore suffered no prejudice from his attorneys' decision not to tender the risk of deportation as grounds for a variance. *Cf. United States v. Mendez*, 362 F. App'x 484, 488 (6th Cir. 2010) ("[The defendant's attorney] did not argue at [the defendant's] sentencing hearing that [the defendant's] deportation upon release should be considered a mitigating factor warranting a variance. . . . Had [he] raised the issue, specific discussion of the point might have been in order, but . . . . it is clear that the district court was aware that [the defendant] was subject to deportation because it specifically recommended that [he] be referred to Immigration and Customs Enforcement ('ICE') for deportation proceedings following his release from prison. It was not an abuse of discretion for the district court to fail to grant [the defendant] a variance based on such awareness." (footnotes and quotation omitted)). Mr. Oboh therefore fails to demonstrate deficient performance or prejudice under *Strickland*'s two-part test. His claim is without merit, and he is not entitled to the extraordinary remedy of § 2255 relief.

### F.  Certificate of Appealability

The Court must now determine whether to issue a certificate of appealability, which is necessary for Mr. Oboh to appeal its ruling. 28 U.S.C. § 2253(a), (c)(1)(B). The Court may

issue a certificate of appealability only when a petitioner "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). To make this showing when a court has rejected a petitioner's constitutional claims on the merits, that petitioner must demonstrate that reasonable jurists would find the court's assessment of those claims "debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Having addressed the merits of Mr. Oboh's claims, the Court concludes that reasonable jurists could debate the question of whether he has suffered prejudice from his attorneys' failure to advise him that deportation was a mandatory consequence of his guilty plea. The Court will therefore issue a certificate of appealability to Mr. Oboh on this specific question, and it will grant him leave to proceed *in forma pauperis* on appeal. As to his other claims, however, the Court does not conclude that reasonable jurists could find that its rejection of those claims is debatable or wrong. The Court will therefore decline to issue a certificate of appealability to Mr. Oboh on those claims.

## IV. CONCLUSION

As the petitioner under § 2255, Mr. Oboh fails to meet his burden of establishing that his conviction and sentence are in violation of the Constitution, or that a fundamental defect resulted in a complete miscarriage of justice or an egregious error. His Emergency Motion Pursuant to [28] U.S.C. § 2255 [Doc. 1] is therefore **DENIED**. The Court will enter an order consistent with this opinion.

ENTER:

s/J. RONNIE GREER
_____
UNITED STATES DISTRICT JUDGE